## THE PEOPLE v. GEORGE WILSON.

*Opening to jury—Relevancy of evidence in murder cases—Refusal to answer —Order of evidence—Arrest without warrant, for larceny.*

1. The interruption of an opponent's opening to the jury to raise questions of its competency, or the restriction of such an opening by the court, is unjustifiable unless in very clear cases of abuse; and any question raised upon it should be disposed of summarily and without argument.

2. It is not error, in a prosecution for murder, to receive testimony from which the suspicion might arise that respondent had also been guilty of larceny, if such testimony is relevant to the charge of murder.

3. Upon a prosecution for a murder committed with a gun, a witness. with whom respondent was familiar, was shown the gun-case that belonged to the gun used, and was asked if that was respondent's gun-case.    He said he did not know; he had never seen it at respondent's house, or in his possession, but he had seen a case that looked like it lying around a good while at the place where he himself worked, and that he had not known what became of it or whose it was until a few weeks before, when a certain person turned up.    The person referred to testified that he was familiar with that kind of

gun, and was allowed to explain its workings to the jury. The respondent himself said on cross-examination that he had had the gun and case about two months, and that they had been handed to him, but he refused to tell by whom. *Held,* that it could not be said that these facts were clearly irrelevant to the charge of murder.

4. A prosecuting officer ought not to allude, before the jury, to the fact that respondent has put himself upon his privilege and declined to answer a question, even though it concerned a collateral inquiry of questionable relevancy; but such a remark is not sufficient ground for disturbing a verdict against respondent.

5. It is within a trial court's discretion, even in a murder case, to admit evidence out of its strict order.

6. It was shown in a murder case that the victim had fired three shots after his assailant had fired at him. Respondent claimed that his victim had fired first, and showed that four barrels of the latter's pistol had been lately discharged. The prosecution then showed, as if in rebuttal, that three had been discharged more recently than the remaining one. *Held,* that though the prosecution had covered the ground, and the evidence was not rebutting, it was within the discretion of the judge to receive it.

7. Whether taking merchandise away from the door of a store clandestinely, is not a larceny from the store itself, and therefore a compound larceny under How. Stat. § 9137—Q.

8. The right to arrest without a warrant remains, in Michigan, in a case of larceny which would be felonious at common law.

9. Where the evidence of a larceny would in itself be sufficient for conviction, the plea that the act was done for fun, and while the person doing it was drunk, is not enough to protect him from arrest.

Error to the Recorder's Court of Detroit. (Swift. J.) November 19.—January 7.

MURDER. Respondent brings error. Conviction affirmed.

Attorney General *Van Riper* for the People.

*Allen Howard Frazer, Levi T. Griffin* and *Robert E. Frazer* for respondent. An officer has no right to arrest without a warrant, for a misdemeanor : *Shannon v. People* 5 Mich. 83 ; *Shay v. People* 22 N. Y. 317 ; *Drennan v. People* 10 Mich. 178 ; *People v. Rawson* 61 Barb. 634 : 1 Whart. Cr. L. § 2 ; *People v. Dutcher* 83 N. Y. 243 ; *People v. Finn* 26 Hun 60 ; *People v. Donald* 48 Mich. 493 ; *People v. Finn* 87 N. Y. 533 ; How. Stat. §§ 9140, 9430 ;

any offense which is not liable to be punished by death or imprisonment in the State prison, is a misdemeanor : *People v. War* 20 Cal. 120 ; *Johnston v. State* 7 Mo. 183 ; *Ingram v. State* 7 Mo. 293 ; *Weinzorpflin v. State* 7 Blackf. (Ind.) 188; *People v. Van Steenburgh* 1 Parker Cr. Cases (N.Y.) 45 ; *State v. Smith* 8 Blackf. 490 ; *State v. Smith* 32 Me. 372; *State v. Mayberry* 48 Me. 236 ; to proceed lawfully the officer must inform the suspect of his official character ; *State v. White* 76 N. C. 15 ; *State v. Underwood* 75 Mo. 238 ; and of the charge against him, and of the purpose of the officer: *State v. Curtis* (1797) 1 Hayw. (N. C.) 471 ; *Bellows v. Shannon* (1841) 2 Hill 92 ; *State v. Kirby* 2 Ired. Law (N. C.) 202 ; 3 Greenl. Ev. (2d ed.) §§ 123, 146 ; *Drennan v. People* 10 Mich. 177 ; *Yates v. People* 32 N. Y. 517 ; *State v. Bryant* 65 N. C. 329 ; 2 Whart. Cr. L. (7th ed.) § 1289 ; *State v. Belk,* 76 N. C. 14 ; *State v. Underwood* 75 Mo. 238 ; the officer would have to treat the party being arrested without unnecessary violence, unless there is resistance ; and in case of violence on the part of the officer towards the prisoner, the latter can use any force, not excessive, in defending himself : *Findlay v. Pruitt* (1839) 9 Port. (Ala.) 195 ; *State v. Mahon* 3 Harr. (Del.) 568 ; *Murdock v. Ripley* 35 Me. 474 ; *State v. Bryant* 65 N. C. 328 ; *State v. Belk* 76 N. C. 14 ; all testimony is inadmissible that relates to a distinct offense : *Albricht v. State* 6 Wis. 74 ; *Hoberg v. State* 3 Minn. 269 ; *Hopps v. People* 31 Ill. 385; *People v. Schweitzer* 23 Mich. 304 ; *Shaffner v. Com.* 72 Penn. St. 60 ; *Rosenweig v. People* 63 Barb. 634 ; *Schaser v. State* 36 Wis. 429 ; or could not be used for impeachment or contradiction, being immaterial and irrelevant : *Fisher v. Hood* 14 Mich. 190 ; 1 Greenl. Ev. § 449.

COOLEY, C. J.    The respondent was tried and has been convicted of the murder of Alonzo E. Bullard, who at the time was a policeman of the City of Detroit.

The following is a condensed statement of the facts developed on the trial.

On Wednesday November 27, 1883, the respondent was residing on Canfield street, Detroit, near Wabash avenue. At about six o'clock in the evening of that day he had or pretended to have an errand at the grocery store of one Heise a little distance from his house on the avenue, and went out to attend to it.    Arriving at the store, according to his story,

he saw Heise standing at the door-way absorbed in conversation with another person. A barrel of oil was in front of the store, and it occurred .to the respondent that he might roll it away without being observed. He had been drinking, and his subsequent claim was that he proposed to himself the rolling off of the barrel by way of joke merely. He did roll it away without at the time being observed, and put it in his own front yard, where he left it until bed-time. He then rolled it into a shed attached to the house, and locked the door.

In the morning the respondent, who was a painter by trade, started out ostensibly to procure work, but found his way after a time to the Russell House, where after noon he was in the company of Freeman, the baggage-master of the hotel, who was an acquaintance. Heise in the mean time had missed his barrel of oil. The barrel was painted a light blue color, and it was easily traced on the stones where it had been rolled. The loss was reported to the Police Department, and officer Bullard proceeded with Heise to investigate. They followed the trail to respondent's place, and looking through the cracks in the shed, saw the barrel there, which Heise thought he identified as his own. Bullard then knocked at the door of the house which was opened by Mrs. Wilson, and the officer asked of her permission to go into the shed. She said it was locked and her husband had the key, and it would be necessary to wait until he returned, which would be between six and seven at night. Bullard said, All right; he would be back at that time,—and went away. Heise was then sent off for a search-warrant, which was obtained and delivered to officer Bendall of the police force, who proceeded with it to respondent's place, meeting Bullard there about half-past three. Bendall called on Mrs. Wilson and said to her he had a search-warrant for a barrel of oil, and it would save a good deal of trouble if she would give it up. She repeated that her husband had the key to the shed and they must wait for his return, but they declining to do this, she went and got a number of keys for them to try in the lock. None of them fitted it, and she

then went to the bed-room and brought one from there, with which the door of the shed was opened and the barrel found partly covered with rubbish. Mrs. Wilson began to cry, and said if her husband had taken anything it was only for " devilment" and she would give it up. Bendall then turned the barrel over to Heise, and inquired of Mrs. Wilson where her husband worked, and she replied, as he says, that he was a painter by trade and worked for Godfrey & Dean, and added that he was not the man most to blame; it was George Smith. Bullard and Heise then started off to procure a warrant, and Bendall went to Godfrey & Dean's for respondent. On making inquiry he found respondent did not work there, and he then went back to the neighborhood of respondent's house, and waited about there until about five o'clock.

When the officers left respondent's place Mrs. Wilson started out to find her husband. She went immediately to the Russell House, where she saw Freeman and asked him where respondent was. Freeman said he had been there just a little while before with Hughes, and he would send Hughes out for him. He did so, and respondent soon came in. Mrs. Wilson told him what had taken place at the house, and urged him to go home and see about it. He said he would go home bye and bye, and when she urged that he go with her, he declined, and sent Hughes. When they got to the house, Hughes threw off his coat and said he should · make himself at home. In a little while officer Bendall came in, bringing with him officer Bullard, who had come back, but without bringing a warrant of arrest. Bendall asked Mrs. Wilson why she had told him her husband worked at Godfrey & Dean's, and she replied she thought he did. Hughes was then observed by the officers, neither of whom knew Wilson though he had been described to them, and Bendall said, "Mrs. Wilson, who is this man here?" Bendall says, she replied it was her husband; and he then inquired of the man if his name was George Wilson, and the man replied it was. Bendall then told him he had a warrant for him for the larceny of a barrel of oil. Mrs. Wilson in her

testimony denies having said Hughes was her husband, but admits that the officers were led to suppose he was, and they arrested him as the thief and started off with him. On the street, when they got a good view of Hughes, the officers saw he was a much older man than respondent had been represented to be, and Bendall said to him "You are not George Wilson." Hughes replied, "I never said I was." Some angry words then passed, and Hughes was turned loose. Bendall then, who was Bullard's superior officer, told the latter to hang around until about seven o'clock, and if Wilson did not come in the mean time, to then go to the station-house.

On the Monday preceding these occurrences, respondent had made arrangements with George Smith to cross the river to Canada with him for duck-shooting. On Wednesday he went up to his house a little before six o'clock, and proposed to start off at once on this expedition. His wife wanted him to see about the oil, but he made light of what she said. He had been drinking, and claimed afterwards to have been intoxicated. He had a loaded gun in the house, and with this he started off, bidding his wife and babe good-bye at the door. Bullard had been watching the house, and had seen respondent go in, and started to arrest him. He came up to respondent almost immediately after he left the house, and made attempt to arrest him. Exactly what words passed between the parties can only be known from the ante-mortem statements of Bullard, and the testimony of the respondent. Quite a number of persons, however, heard the discharge of a gun, which is not disputed to have been the fowling-piece in respondent's hands, followed almost immediately by three lighter discharges, which were from a pistol in the hands of Bullard. Respondent claimed that Bullard fired four times—once before he fired, and three times afterwards—but there is no supporting evidence for this except that when Bullard's pistol was found, there were empty shells in all the four barrels, and some witnesses testified that all the barrels had the appearance of having been recently discharged.

Respondent ran off after the shooting, and Bullard was found by people who came up, to be dying from a mortal wound in the abdomen. He stated to a number of persons that he was shot by respondent whom he was endeavoring to arrest. Respondent after the shooting went off and found Smith, and proposed to go then for their hunt. Smith assented, and they went to the river at the foot of Campau avenue. Instead of taking the ferry they followed up the river to Hamtramck, where Wilson procured a row-boat, and they crossed the river. When they got over into Canada, respondent for the first time told Smith about the shooting, and Smith then declined to go with him further and turned about and re-crossed the river. Respondent went on alone, and went to the farm of one Caldwell. The next day was Thanksgiving day. The morning Detroit papers contained an account of the shooting and death of the officer, naming respondent as the murderer, and stating that a reward was offered for his apprehension. A copy of one of the papers was seen by a man at Caldwell's, who handed it to respondent. Respondent read it without much remark. Soon after officers from Detroit were seen coming, and respondent ran and hid himself in the barn. Officer Fitzpatrick followed, found and arrested him. Officer Swartwood while he was in custody undertook to inflict violence upon him, but this was prevented by others. Respondent consented to be taken back to Detroit, and he was so taken back immediately. Meantime his wife had been taken to the police station where she remained a number of days without complaint being made against her. Proceedings being then taken for her release, a formal complaint was made but though she was further detained on this, it was not followed up.

A great number of exceptions were taken to the rulings of the Recorder on the trial, and they have been argued in this Court with much earnestness and ability. They begin with exceptions to the latitude allowed to the counsel for the People in making his opening statement of the case, and they were interposed at nearly every stage in the proceedings. Such of them as appear to us to require attention will be noticed in their order.

I. The complaint of the latitude permitted to the prosecuting officer in his opening has no just foundation. That officer himself might with more reason have protested against the interruptions to which he was subjected while he was stating the case which he expected to prove.

Since the decision of the case of *Scripps v. Reilly* 38 Mich. 10, an impression seems to have prevailed with some members of the bar that the opening statements of counsel might be challenged step by step, and questions of relevancy and materiality of evidence raised and considered and even argued at length, on counsel stating what he proposed to prove. Under this impression the practice of interrupting counsel and demanding the judgment of the court on the competency of what he proposed to show has in some cases been carried to extraordinary lengths, and elaborate arguments had been indulged in over the question whether counsel should be suffered to make certain statements of proposed evidence to the jury. Any such a practice is a great abuse, and in a desperate criminal case might be resorted to for the purpose of defeating the ends of justice, by breaking the force of a connected statement of the case to the jury, and by prolonging the trial until the trouble and expense should dishearten the authorities and result in a relaxation of effort for conviction. The cases must be rare in which counsel would be justified in interrupting the opening of his antagonist to raise questions of competency; and when he does so, the questions ought to be disposed of summarily and without argument. Only a very clear case of abuse would justify the court in interrupting and restricting the counsel's opening: *Porter v. Throop* 47 Mich. 313; and no such case of abuse appears in this record. The prosecution as we have no doubt, stated in good faith what it was expected to prove; and we discover no indication of a purpose to drag in irrelevant or incompetent matter with a view improperly to influence the jury. At the same time, in view of what has been said of the abuse of interruption, it is proper to add that there is no indication of want of good faith on the part of the defense in this case in raising the questions as they did.

55 Mich—33

II. Freeman, the baggage-master of the Russell House, was examined as a witness for the People, and while on the stand was shown a gun-case which it already appeared was the case belonging to the gun with which Bullard was shot. He was asked if that was respondent's gun-case, and replied that he did not know; he had never seen it in Wilson's house or possession, but he had seen a gun-case looking like it in his own baggage-room. . Under objection by the defense he was permitted to say further that there was a gun-case lying around there in the baggage-room a good while that looked like that, and he did not know what became of it nor whose it was until a few weeks before, when Mr. Hopkins turned up.

When respondent took the stand on his own behalf he was asked on cross-examination how long he had had the gun and case in his possession. The question was objected to, but allowed, and he replied, about two months. He was further asked where he found them, and replied, they were handed to him. He refused to tell by whom they were handed to him, and the court declined to compel him to do so. Hopkins was subsequently called by the prosecution, and was allowed, under objection, to state that he was familiar with that kind of a gun, and to explain its working to the jury.

The objections of the defense were upon the ground that the prosecution were seeking to create a prejudice against the defendant, by giving evidence which tended to show that he was guilty of another offense, namely, the offense of stealing the gun. But no evidence of a larceny of the gun was given. A suspicion that the gun was stolen from the Russell House might arise from the testimony of Freeman and the refusal of the defendant to tell from whom he obtained it ; but it would be no more than a suspicion. There could be no error in the prosecution proving or attempting to prove the facts from which the suspicion would arise unless they were irrelevant to the charge of murder, and we cannot say that they were clearly so. It might have been important to show when and where respondent procured the gun, and also to show its workings.

In his summing up the prosecuting officer alluded to the fact that the respondent when questioned about the ownership of the gun put himself on his privilege and declined to state. The remark was objected to, and was not followed up. It would have been more proper to have abstained from making it, but the remark affords no sufficient ground for disturbing the verdict.

III. All the evidence for the prosecution tended to show that four shots were fired and four only; the first shot being from the gun. Respondent claimed in his testimony that Bullard fired first; and if so, five shots must have been fired. In support of this theory evidence was given by the defense that all four of the chambers of Bullard's pistol appeared to have been recently discharged. When the prosecution took the case in rebuttal they were allowed to show that though all four of the chambers showed they had been discharged, three of them had the appearance of having been discharged more recently than the other. This evidence was objected to as improper at that stage of the case. It was said, and truly said, that the prosecution covered that ground in making their case at the outset; and that this evidence was not in any sense rebutting. But it does not follow that the court committed error in receiving the testimony. The admission of evidence out of strict order is commonly in the discretion of the court; and it has repeatedly been held to be so in cases like the present. *Detroit &c. R. Co. v. Van Steinburg* 17 Mich. 99; *Danielson v. Dyckman* 26 Mich. 169; *Somerville v. Richards* 37 Mich. 299; *Brown v. Marshall* 47 Mich. 576.

IV. The error most strongly relied upon relates to the ruling of the court upon the arrest. The arrest was made without warrant; and if the officer had no right to make it, resistance to it must have been legal. The Recorder instructed the jury as follows:

" If a barrel of oil had been stolen from Heise, a felony had been committed, and if the defendant was a thief, Bullard had a right to arrest him without a warrant. He would also have the same right although no larceny in fact had been committed, if there was reasonable ground and

probable cause for believing that a larceny had been committed, and that the defendant was the guilty party. Any facts which would induce any fair-minded man of average intelligence and judgment to believe that a larceny had been committed would be probable cause and reasonable ground for such belief."

"It was the duty of Bullard, in arresting the defendant without a warrant, to inform him of the nature of the charge against him, and of his own official character. If the defendant knew what the charge against him was, and that Bullard was an officer, then Bullard was justified in arresting the defendant, without giving such information, as I have mentioned; and in either case if the defendant, without any other provocation or excuse, killed Bullard, he was guilty of murder."

These instructions assume that the offense for which Bullard attempted to arrest the respondent was a felony. This is contested by the defense, who insist that no larceny is a felony in this State unless the value of the property exceeds twenty-five dollars, so as to make imprisonment in the State prison the penalty. And it seems to be taken for granted on both sides that the value of the barrel of oil was less than twenty-five dollars, though there was no proof on the subject. It may be questionable whether the larceny in this case was not larceny from a store, and therefore compound larceny, under How. Stat. § 9137; but we do not deem it necessary to pass on that point. It was decided by this Court in *Drennan v. People* 10 Mich. 169, that common-law felonies were still felonies in this State, and that the term "felony" was not defined by our statutes, except in its application to statutory offenses. The defense insist that this decision is erroneous, and we are urged to review it. If serious mischief could arise from it we might be inclined to do so; but the decision seldom becomes important except when the right to arrest without warrant is involved, and it may be doubtful if the good of society requires that the right to arrest without warrant should depend in cases of larceny upon the value of the property stolen. It is certain that the rule as laid down in *Drennan v. People*, and which was merely a rule of statutory

construction, has been recognized and acted upon for more than twenty years, and if known evils had sprung from it, we must suppose the Legislature would have taken notice of them and applied the remedy. This not having been done, we see no sufficient reason for questioning the decision ourselves.

But it is further claimed by the defense that Bullard had no sufficient knowledge or information or ground for suspicion that a larceny had been committed by Wilson. He could not know, it is said, but that the oil was taken in sport, as Mrs. Wilson had said, or when Wilson was too intoxicated to form the felonious intent. And in Bullard's talk with Mrs. Wilson it is claimed he said it would be "all right" if the oil was delivered up; which would go to show he did not believe there was a larceny.

Upon this it is only necessary to say that the facts, even as stated by respondent himself, were such that any impartial jury ought to have been satisfied by them of his guilt. The suggestion of a taking in sport would not be likely to deceive any one, and the attempt to make a vice excuse a crime is becoming too common to be listened to with much patience. There was abundant reason for the officer believing in a larceny by Wilson, and he must have been stupidly incredulous if he had not believed it.

But it is said there is no evidence that respondent knew the official character of Bullard, or that he was informed of the reason for the attempted arrest. We think otherwise. Respondent is alive to tell his story: Bullard is killed. But certain facts are very plain, and nothing that respondent is able to say could change them. He knew he had taken the oil and locked it up on his own premises, and that the officers had found it there. He also knew that the officers were looking for him. When he had shot Bullard on pretense of self-defense and gone to Canada, he endeavored to keep out of the way and concealed himself, as a man conscious of innocence is not likely to do. Clara Fox says that when she asked respondent, immediately on his shooting and starting to run, what he did that for, he replied, "If I had another

one left I would give it to you." This does not sound much
like a man who has merely exercised the legal right of self
defense, or who thinks he has.

Bullard, in his dying moments, made his statement of the
affair to several persons. To Peter Dunsmore he said he
told respondent "We want you down to the station about a
barrel of oil," whereupon respondent stepped back a pace,
and fired a shot into him. To others he said that when he
spoke to respondent the latter deliberately backed up and
fired. To Charles Sutter he said he told respondent he had
a warrant for him, and wanted him to go with him to the
station, when respondent stepped back and fired. Bullard
did not at the time wear his uniform, but the evidence is
abundant that respondent knew he had come to arrest him
for taking the oil, and that he assumed to be an officer. And
the jury were fully justified by the evidence in finding the
shooting to be deliberate murder.

Sharp criticism was made on the argument of the conduct
of the Police Department in detaining Mrs. Wilson for a
long time in custody, as being cruel and unusual, and having
an improper motive in view. Respecting that we have noth-
ing to say here, because it has nothing to do with the legal
questions now before us. The same might be said of many
other things which were brought into the discussion in this
Court. We have carefully reviewed the brief made for the
defense, as well as the oral argument, and think we have
taken notice of all the assigned errors which required special
attention. The trial appears to have been conducted by the
Recorder with the utmost fairness, and his leanings in doubt-
ful rulings generally favored the respondent.

The judgment must therefore be affirmed.

The other Justices concurred.