## THE PEOPLE v. AMIEL GOSCH.

*Criminal law—Conduct of prosecutor—Sheriffs—Evidence—Warrant —Idem sonans.*

1. A verdict will not be set aside for alleged improper remarks of the prosecuting officer in his argument to the jury, unless a clear case of abuse is shown, whereby the respondent's rights were prejudiced.

2. On the trial of a respondent for murder, it was claimed by the prosecution that the deceased was present to assist a deputy-sheriff in the arrest of the respondent; and the officer was allowed to testify to his appointment, and the deputy county clerk to the date of its filing, and the appointment and oath of office were received in evidence, all on rebuttal by the people. And it is held that the testimony was competent, and its admission at that stage of the trial discretionary with the court.

3. A supervisor of a township is not disqualified from holding the office of deputy-sheriff, under section 5, Art. 10, of the Constitution, which provides that a sheriff shall hold no other office.

4. The names "Amel" and "Amiel," and "Brailey" and "Brearley," are *idem sonans*.

5. A request to charge is properly refused where there is no testimony in the case justifying the court in giving it to the jury.

6. Where the wife of a respondent testifies as a witness in his behalf, the people are entitled to a full and fair cross-examination of the witness upon all matters relevant to the case.

Error to Kent. (Burch, J.) Argued June 12 and 13, 1890. Decided July 2, 1890.

Respondent was convicted of manslaughter, and sentenced to 12 years' imprisonment in State prison. Judgment affirmed. The facts are stated in the opinion.

*William F. McKnight* and *J. A. Fairfield* (*Birney Hoyt*, of counsel), for respondent.

*B. W. Huston,* Attorney General, and *W. J. Stuart,* Prosecuting Attorney (*Stuart, Knappen & Weaver,* of counsel), for the people.

[The points of counsel are stated in the opinion.— REPORTER.]

LONG, J. The respondent is charged, jointly with Charles Brearley, with having killed and murdered one Daniel Sinclair, at the township of Bowne, Kent county, on August 13, 1889. They took separate trials. On a trial had in the circuit court of that county, the respondent was found guilty of manslaughter, and sentenced on October 16, 1889, to imprisonment in the State prison at Jackson for the term of 12 years. The case comes to this Court by writ of error.

The theory of the people on the trial below was that on August 12, 1889, one Peter Sinclair, a deputy-sheriff of Kent county, and a brother of the deceased, was threshing at the farm of Mr. Anderson in that township, and that the respondent and Charles Brearley were also there threshing on that day; that Peter Sinclair left the premises during the day with one Tyler, and went to Grand Rapids to procure a warrant for the arrest of respondent and Brearley for the larceny of wheat from Tyler; and that the reason of Sinclair's departure for Grand Rapids became known to respondent and Brearley, who quit work and returned to the house of respondent, hitched up a horse, and went away; that Sinclair and Tyler visited the prosecuting attorney, and then went to the justice, procured the warrant,—Tyler making the complaint,—and returned, when they found upon inquiry that the respondent and Brearley had gone to Middleville, in Barry county; that Sinclair, with his brother-in-law, Mr. Silcox, drove to Middleville, and there ascer-

tained from Mr. Otto, a merchant at Middleville, that
they had been there, but had departed, ostensibly, for
home; that Sinclair and Silcox were then and there
warned by Otto that these men were of desperate char-
acter, and might resist arrest, and they might have
trouble in arresting them. They thereupon drove back
to the house of Silcox, arriving there late at night; and,
Sinclair arming Silcox with a revolver, and being himself
armed with one, they proceeded to the residence of Gosch,
accompanied by various persons on the route,—some 12
or more in number.

Arriving in front of the house of Gosch, Daniel Sin-
clair, the deceased, came up with others, and was told by
his brother, Peter Sinclair, that he had been warned of
serious danger in making the arrest while at Middleville,
and the parties were requested to accompany him in case
he had much trouble. They thereupon proceeded to the
front door of the house of Gosch. This was a one-story
frame structure; the end facing the road, and standing
back therefrom about five or six rods. The house had
one door upon the front end, and one to the rear,
but no windows except upon the sides, about midway.
Sinclair and Silcox, followed by several persons, among
whom was the deceased, moved up to the front door,
which consisted of rough boards, and opened outwards,
being fastened inside with a hook. Sinclair rapped on
the door, the others remaining silent. Receiving no
answer, he rapped several times, and called the respond-
ent by name, and stated that he wanted him to get up,
as he had a warrant for the arrest of himself and Brearley.
This was about 1 or 1:30 o'clock in the morning. Hear-
ing a noise inside, he called the respondent again by
name, and told him he had a warrant for his arrest, and
that, if he would open the door, and come out, and give
himself up, no harm in any way would be done him. He

received a response, believed to be in the voice of respondent, asking if he "knew where the road was." He answered, "Yes," when the respondent replied, "You had better get there, then." He again reiterated that he wanted him, when Brearley, with an oath, said, "You can't have us." Sinclair then stated that he would give them a minute or two minutes in which to open the door. About that time, Silcox took up a grub hoe which was lying near, and inserted it in the crack between the door and casement, with the inquiry of Sinclair if he had the right to open the door, to which Sinclair responded: "Yes; but I don't desire to break open the door, but will give them time to open it,"—and told Silcox to desist, which he did; and it is claimed that almost immediately the door was opened from the inside, and the respondent's dog came out, being directed by some one inside to "sic em;" that, as the dog came out, Silcox stepped to the opening, and almost in front, and saw Brearley standing inside, and plainly recognizable by the light of a lantern and by the aid of the moon, his form being outlined against a window opening in the side of the house which was in the rear; that he had a revolver drawn and cocked, and held straight forward towards the opening in the door; that Silcox dodged down, and sidewise, and a shot fired by Brearley passed by him, doing no damage; that he immediately returned the fire, and Peter Sinclair stepped forward towards the opening, when another shot, fired by some one inside, wounded him in the head, and he immediately fired, himself, hitting Brearley, who fell to the floor with an outcry; that immediately following this a gun barrel was thrust through the door, and the respondent was heard to exclaim, with an oath, "I will shoot your hearts out!" The gun was fired, and Daniel Sinclair was seen to fall, placing his hands over his breast, exclaiming, "I am

shot!" Thereupon the parties scattered. Daniel Sinclair died almost immediately from this wound inflicted by the respondent. The respondent at once fled from the back door of the house, and a few days thereafter was captured in Barry county.

It was also claimed by the prosecution that, quite a long while previous to the tragedy, respondent had expressed a feeling about the arrest of his cousin by Peter Sinclair, and had threatened that, if Sinclair ever attempted to arrest him, he would not be taken alive; that one or the other of them would be killed. It also appears that, the day before the affray, Mr. Otto and a Mr. Hendricks went to the house of respondent to collect a debt of him, and while there a talk was had about the threatened arrest of respondent and Brearley by Tyler, and the respondent again made threats, in the presence of Otto, of what he would do if the arrest was attempted, his wife and Otto remonstrating with him about it, and that these threats were again made in the presence of Hendricks there; that later, and in the evening of that day, when respondent and Brearley visited Middleville, Otto renewed the subject with him, and remonstrated with him about such violent talk, when he said he had changed his mind, and that, if Sinclair came to arrest him, he would set the dog on him, and lick him. Substantially, this is the claim of the people, as made to appear on the trial.

The claim of the defense was that, in fact, Sinclair, the deputy-sheriff, had arrested the cousin of respondent without warrant, and carried him beyond the State line into Illinois, and that Gosch had a perfect right to say what he did, with that qualification; that a high state of feeling existed between Sinclair and respondent, owing to difficulties which had previously occurred in an election, whereat Sinclair was a candidate for supervisor,

in regard to assessment of the property of respondent. It was also claimed that Sinclair drank several times during the day of getting the warrant at Grand Rapids, and was not in a proper condition to execute the warrant; that the warrant was procured at the instance of Sinclair, and was for petty larceny, and for several reasons void, and furnished no protection to Sinclair, or any of the *posse* who accompanied him.

It was further claimed that, when Sinclair and his *posse* arrived at the house, Brearley was in bed in one room, and respondent, and his wife and his five small children, were in the only other bedroom, all asleep; that Gosch's wife had informed him and Brearley upon their return from Middleville, and before they retired, that she had heard men in the highway, in front of the house, using language, which she supposed related to them, which had put her in fear; that, at the time the summons first came, respondent's wife was awakened and got up, but that her husband was still asleep; that, when she heard them talk about opening the door, she awakened her husband; that in the mean time Brearley had got up and dressed, and was out in the front room; that the door was opened from the outside, the staple being drawn, and the dog ran out; that the first shot was fired from the outside, and struck the parlor stove in the front room, glanced off, and struck the wall; that then Brearley fired with his revolver, when a second and third shot were fired from the outside, and perhaps more; that Brearley fell, exclaiming he was shot; that the wife of Gosch was stunned by one of these shots, and fell, supposing that a shot had hit her, exclaiming that she was shot; that meanwhile Gosch had procured his gun, but, without using threats, and without knowing the purpose of the party on the outside, fired this shot from the gun which killed Daniel Sinclair, and, supposing that his wife was

wounded, and the mob assailing the house, escaped, and hurried to Middleville to obtain a doctor; that the threats, if any were made, to Otto and Hendricks, were made under great stress of emotion, but that he had quieted down when he reached Middleville, the night before, and had made up his mind to submit to the arrest, and so stated to Otto; that, being awakened as he was, and believing his wife to have been shot, and his children's lives, as well as his own, in danger, he fired the fatal shot; and that such firing and killing were justifiable, under the circumstances.

The claim of the people, as well as of the respondent, was fully submitted to the jury, substantially as above. One hundred and forty-eight errors are assigned. However, in the brief of counsel for respondent, these assignments are discussed under 14 different heads, and will be noticed in their order, remarking at the outset that, after a careful reading of the record and the briefs, and listening to the able arguments of counsel, we are fully satisfied that the respondent has had a very fair trial, and his case was submitted to the jury under a charge eminently fair, laying down correct principles of the law as applicable to the case, giving the defendant the benefit of every doubt arising in the case as presented by the evidence. I have never read a charge given by a trial court wherein the legal rights of a respondent in a criminal case have been more jealously guarded and protected.

It is contended by counsel for respondent, first, that the court was in error in allowing the prosecuting attorney, at the opening of the case, to make disparaging remarks about the respondent, which had a tendency to prejudice his rights before the jury. The remarks complained of were at the outset as follows:

"For some time previous to the night of the killing,

there had been thefts committed in the neighborhood, thefts of wheat and other articles, from farms."

And at the closing argument he remarked:

" There is nothing which so stirs up farmers as stealing wheat, wool, and horses; and these men, who were there threshing, had heard about this alleged wheat stealing."

It is claimed that these remarks were not admissible, as they were a statement that the respondent had been guilty of other crimes than the one for which he was then being tried. These statements did not connect the respondent or Brearley with such thefts, except the fact that Tyler had lost wheat, with the theft of which respondent and Brearley were charged in the warrant. This theft was one of the facts which the prosecuting attorney had a right to discuss. It was inseparably connected with the case, and the procuring of the warrant, and the officer having it in hand for execution, was the justification for his going there that night. No statement was made connecting the respondent or Brearley with any other thefts. It is only in a very clear case of abuse shown by the remarks of the prosecuting officer, and where the respondent's rights have been prejudiced thereby, that this Court will set aside a verdict otherwise manifestly proper. *People v. Wilson*, 55 Mich. 513 (21 N. W. Rep. 907); *Porter v. Throop*, 47 Id. 313 (11 N. W. Rep. 174). We find nothing in these remarks which were improper, or of which the respondent, in view of the facts shown on the trial, has a right to complain.

It is claimed that Peter Sinclair was not a deputy-sheriff, and had no right to make the arrest under the warrant procured by Tyler. Testimony was given by the people on the trial tending to show that Sinclair was a deputy-sheriff, and acting as such at the time of the attempted

arrest. It is claimed, however, that this testimony of Sinclair as to his appointment, and the testimony of the deputy county clerk of that county of the time of filing the appointment, and the oath of office and acceptance of the appointment by Sinclair, were a part of the affirmative case of the people, and in no sense rebutting testimony. The testimony was clearly competent, and its admission within the discretion of the trial court. *People v. Wilson*, 55 Mich. 515 (21 N. W. Rep. 908), and cases cited; *People v. Marion*, 29 Id. 31; *People v. Durfee*, 62 Id. 487 (29 N. W. Rep. 109).

It is also claimed that the appointment of Sinclair was void for the reasons:

1. Because the appointment was not recorded as required by the statute.

2. Because, at the time of his appointment, the evidence shows that he was holding the office of supervisor of that township. Article 10, § 5, of the Constitution of this State, provides that a sheriff shall not hold any other office; and an officer who seeks to justify himself in case of homicide must prove that he holds the office *de jure*.

Whether or not one holding the office of sheriff is debarred by this provision of the Constitution from holding any other office does not become important in the present case. It is apparent that the officer was regularly appointed, and took the constitutional oath, and was an officer *de jure* at the time of the attempted arrest. He was acting under such appointment, and there is nothing in the case showing that he was not acting in good faith, and in the full belief that his acts as an officer were valid. He was not disqualified to hold the office of deputy-sheriff by reason of being supervisor of the township.

It is also claimed that the warrant was void for the reason that it did not properly name the respondents. In the warrant the first name of Gosch was spelled

"Amel" instead of "Amiel," and the name of Brearley was spelled therein "Brailey." This claim is scarcely worthy of notice. The names are *idem sonans*. *Reading v. Waterman*, 46 Mich. 107 (8 N. W. Rep. 691); *Kinney v. Harrett*, Id. 87 (8 N. W. Rep. 708); *Boyce v. Danz*, 29 Id. 146; *People v. Hildebrand*, 71 Id. 313 (38 N. W. Rep. 319).

The respondent's counsel contend that the court was in error in refusing to give the following request to charge·

"If the jury find that Mr. Tyler, who made the complaint upon which the warrant was issued against defendants on the charge of larceny, was so intoxicated that he was unfit to do business, then the complaint and warrant were void for that reason; and, if Peter Sinclair was present when such complaint was made, and knew of such intoxicated condition of Tyler, the warrant was void in his hands."

After a careful examination of the record, I am unable to find any testimony which would have justified the court in giving this request. Such requests must be founded upon some testimony in the case, and, if none is given, the request should be refused. The only testimony given was that of Sinclair and Tyler, from which it appears that on the day of making the complaint, and previous to the issuing of the warrant, each drank once in Caledonia at dinner-time, two or three hours before the warrant was issued; and there is no testimony showing that Tyler was at all affected by liquor when the complaint was made.

It is also claimed that the testimony of Peter Sinclair as to what Otto told him about respondent's and Brearley's intention to resist arrest, and the caution given by Otto, and by reason of which Sinclair took assistance with him in making the arrest, was incompetent and inadmissible for the reasons—

1. That the evidence shows that Sinclair did not rely upon the statements made by Otto to him, for he had

already borrowed a revolver at Caledonia early in the evening, besides the one he had in his own possession.

2. That deceased was not present at the request of Sinclair that night, as he was present in front of Gosch's premises at the time of the attempted arrest, and proceeded to the house without the request and bidding of Peter Sinclair.'

This testimony was clearly competent to show the reason of the precaution taken by the officer in making the arrest. There was also some evidence tending to show that Sinclair, the deputy-sheriff, requested the *posse* there that night to accompany him to the door, as he feared resistance. The threats made by respondent against Sinclair, and his threatened resistance of an arrest, should one be attempted, were also competent to go to the jury, as showing the circumstances under which the killing took place, and who were the responsible parties for the death of Daniel Sinclair.

Some claim is made that the testimony drawn out on the cross-examination of Mrs. Gosch was incompetent. Mrs. Gosch was introduced as a witness by the respondent, and gave testimony in his behalf. On taking the witness, counsel for the people had the right to a full and fair cross-examination upon all matters relevant to the case; and the fact that she was the wife of the respondent could not, upon such cross-examination, shield her from any inquiry which might properly be made of any other witness.

It is also contended by counsel that Gosch, being attacked in his own house, was not obliged to retreat, and had a right to defend himself, and that his actions were to be judged from the circumstances as they appeared to him; and whether he made threats or not did not take away his right to defend himself. As has been before stated, the court, in its charge, jealously guarded the rights of the respondent; and a perusal of

the charge is a sufficient answer to the complaint made by counsel in that behalf. The court charged the jury, among other things, as follows:

"First I will give you the requests, so far as allowed, of the counsel for defendant:

"'The defendant, Amiel Gosch, had a lawful right to defend himself if wrongfully assaulted, and in danger of suffering great bodily harm, or losing his life; and, in doing so, it was his right to shoot and disable or kill his adversary, if it was necessary, from the circumstances as they appeared to Amiel Gosch, to preserve his own life, or prevent great bodily harm to himself.

"'In defending himself, Amiel Gosch had a right to act upon the circumstances as they appeared to him, if wrongfully assaulted; and if, from his stand-point, as it appeared to him, and as he believed, he was in danger of losing his life, or suffering great bodily harm, he had a right to protect himself by any means or by any weapon within his reach.

"'In this case, if the jury find that Amiel Gosch was waked up about the hour of 1:30 o'clock in the morning, and when he had got up, and partially dressed, the front door of his house was opened, and the firing of revolvers commenced to be made into the room where he was from outside the house, and it then appeared to him that he was in great danger of being shot, then he was justified in firing at the persons who were shooting into his house, and is not guilty.

"'In order for Peter J. Sinclair to protect or justify himself for his assault upon the inmates of Gosch's house, it must appear that he was a deputy-sheriff, lawfully appointed, and had a legal warrant for the arrest of both Gosch and Brearley; that his action was a reasonable effort to arrest them, and was necessary under all the facts of the case.

"'The attempted arrest was unlawful if the jury do not find, beyond a reasonable doubt, that the respondent understood, from information given at the time by the officer, that the officer had a warrant for him, for the arrest of the respondent.

"'The respondent had a right to defend his own home, wherein his family was, and a right to resist and kill any person or persons who attempted to enter his home in the night-time by force, and the use of deadly weapons, where it was apparent an assaulting party was present in considerable numbers, unless it shall be found by the jury, beyond a reasonable doubt, that the respondent not only was informed, but heard and understood, that Sinclair was an officer, and had the warrant with him, and that the purpose of the persons with him, as well as his own, was merely to

82 MICH.—3.

effect the arrest; and if he so understood,"—that is, understood as stated in the forepart of this paragraph,—and if he so understood, 'he was justified in killing any person or persons who attempted forcibly to enter his house; and that he need not, in defending his home, retreat.

"'If respondent, Gosch, in making remarks as to the arrest of Wilkes that he would not have been arrested, referred to it as a case where there was an arrest for an offense committed out of the State, and without warrant or extradition papers, then his remarks were fully justified. Such an arrest would be unlawful, and the person sought to be arrested would have a lawful right to resist.

"'The testimony of the people's rebutting witness, Johnson, where he pretends to relate statements of defendant's wife that' she at different times read accounts of the arrest of different persons, and that defendant Gosch, on such occasions, said that he would not have been arrested, are wholly inadmissible in this case, and should not be considered by the jury.

"'That the pretended admission or statements of the wife of respondent, Gosch, which have been testified to by some of the people's rebutting witnesses, should be considered by the jury with the greatest caution. Even if the jury find that defendant, Gosch, had made threats to resist the officer, yet the making of such threats does not deprive him of the right to defend himself, or to defend his wife and children. Mere words will not take away the right of self-defense.' That, gentlemen, is given you, with the qualification that he acts in good faith.

"'If, from the time of the night when the attempted arrest was made, and from the gathering of a considerable number of men with the officer, and the suddenness of the attempt to enter the house, the firing of revolvers into the house, defendant, Gosch, believed that it must not have been an attempt to arrest him, but an unlawful assault being made upon him, then he would have the right to defend himself, and to act upon the circumstances as they appeared to him.

"'In attempting to make an arrest of defendant under the warrant, if Peter Sinclair apprehended resistance, it was his duty to proceed with caution and forbearance.' I give you that, with the statement that it must be reasonable caution, and reasonable forbearance."

Many matters discussed by counsel are questions of fact, and upon which the witnesses are not agreed, and which were left to the decision of the jury. While it may be

true that the officer acted hastily, and somewhat impru-
dently, in taking so large a *posse* there on that night,
yet we cannot say that he was not justified, under the
circumstances, in so doing. Threats of resistance of
arrest, and threats of bodily harm, if not death, at the
hands of the respondent, had been communicated to him
before the attempted arrest. When arriving at the house
of the respondent, he requested him to surrender to the
arrest, and assured him that no harm would come to him
if he would do so; and, if the testimony of the officer
and others is true, he was met by a refusal to surrender,
respondent as well as Brearley both advising the officer
he had better get into the road, and that they would
not be taken. Instead of coming out, and submitting to
the officer's lawful authority, they prepared to defend
themselves,—one with a revolver, and the other with a
gun; Brearley firing the first shot, and the defendant fir-
ing his gun into a promiscuous crowd. The charge of
the court, above quoted, given at the request of respond-
ent's counsel, placed his case before the jury in a most
favorable light for him. The facts shown by this record
fully warranted the verdict found, and it cannot be dis-
turbed.

The judgment must be affirmed.

CHAMPLIN, C. J., CAHILL and GRANT, JJ., concurred
with LONG, J.

MORSE, J. In this case, I think the manner and the
time of making the attempt to arrest the respondent and
Brearley was an outrage, and altogether unnecessary. If
Sinclair had used a little prudence and caution,—waited
until day-time to make the arrest, and not gone upon
respondent's premises in the middle of the night, with a
crowd,—there would, in my opinion, have been no sacri-
fice of human life. The result has been the death of

Sinclair's brother, the insanity of the respondent, and the breaking up of his home. For this the officer is not entirely irresponsible. But the case was fairly tried, and it is not my province to overrule the finding of the jury, who are the proper judges of the questions of fact. I therefore agree in the affirmance.