PEOPLE *v.* UTTER.

1. CRIMINAL LAW—CONFESSION PROCURED BY FRAUD—ADMISSIBILITY.

     The fact that a confession was procured by artifice, deception, or fraud will not exclude it if the artifice or fraud employed was not calculated to procure an untrue statement.

2. SAME—CONFESSION—VOLUNTARY—QUESTION FOR JURY.

     Where there was no conflict in the testimony as to what occurred when an alleged confession was made, but defendant claimed not to remember making or signing any confession, it was properly received in evidence; and the rights of defendant were sufficiently safeguarded by submitting to the jury, under proper instructions, the question as to whether it was voluntarily made.

3. SAME—WITNESSES—REBUTTAL—INDORSEMENT ON INFORMATION.

     Indorsement of names on the information as rebuttal wit-

On admissibility of confessions procured by artifice or fraud, see notes in 18 L. R. A. (N. S.) 840; 50 L. R. A. (N. S.) 1088.

On effect of statutory declaration that murder committed by certain means, or in commission of felony, shall be murder in the first degree, upon right of jury to pass upon degree, see notes in 12 L. R. A. (N. S.) 935; L. R. A. 1916D, 610.

nesses, after defendant rested, on a proper showing by the prosecution that the importance of their testimony was not known until defendant had testified, *held*, proper.

4. SAME—EVIDENCE—REBUTTAL.

Testimony of witnesses, called in rebuttal, relating directly or indirectly to new facts testified to by defendant, with denial or qualification of facts shown by the prosecution, to conform with the theory of the defense, *held*, properly received.

5. SAME—REBUTTAL EVIDENCE—DEFINITION.

Rebuttal evidence is defined as that given by one party to contradict, repel, explain, or disprove evidence produced by the other party and tending directly to weaken or impeach the same.

6. SAME—DISCRETION OF COURT.

As to what is properly rebuttal evidence, *held*, largely within the discretion of the trial court.

7. SAME—TRIAL—INSTRUCTIONS.

An instruction to the effect that a truth by a detective "is just as good as the truth from any other source," *held*, not prejudicial because tending to convey to the jury the idea that "even though this witness is a detective he was telling the truth," when considered in connection with the charge as a whole, which properly safeguarded the rights of defendant.

8. HOMICIDE—LESSER OFFENSES—PROOF—INSTRUCTION.

In a prosecution for murder in the first degree, defendant is not entitled to have submitted to the jury the lesser offenses covered by said charge, where the facts necessary to constitute the lesser offense are not proven.

9. SAME—STATUTORY—COMMON LAW—DEGREE—PROOF.

While murder in the first degree is defined by 3 Comp. Laws 1915, § 15192, it also includes the common-law definition, and, where appropriate, a simple information charging the common-law essentials of murder may be laid, and the jury convict of any degree which the proof establishes.

10. SAME—TRIAL—INSTRUCTION AS TO DEGREE.

Where defendant was charged with statutory murder, "committed in the perpetration" of robbery, declared by the statute (3 Comp. Laws 1915, § 15192) to constitute

murder in the first degree, and the proofs were confined to that charge, defendant not disputing that deceased was so killed but claiming not to be a party to the crime, the trial judge was not in error in instructing the jury that their verdict should be murder in the first degree or not guilty.

11. SAME—INSTRUCTION—LESSER OFFENSE—REQUESTS TO CHARGE. Where the trial judge charged the jury that, to convict, they must find that defendant entered into a conspiracy or agreement before the blow was struck which killed deceased to go and execute the crime of robbery upon him, defendant may not complain of the court's failure to instruct that he might be convicted, under the evidence, of a lesser crime, on the theory that he did not know of the contemplated robbery until the blow was struck by another, and even though he participated in taking money from the body of deceased he would simply be guilty as an accessory after the fact, especially where no request was made for such instruction.

Error to Ionia; Davis (Frank D. M.), J. Submitted October 13, 1921. (Docket No. 24.) Decided December 21, 1921.

Warren Utter was convicted of murder in the first degree, and sentenced to imprisonment for life in the branch of the State prison at Marquette. Affirmed.

*W. J. Barnard,* for appellant.

*Merlin Wiley,* Attorney General, and *J. Clyde Watt,* Special Prosecuting Attorney, for the people.

STEERE, C. J. After dark on the evening of November 25, 1918, a man named John Smary who lived alone in a small sequestered building, called by witnesses a "shanty" or "shack," near a creek in the outskirts of the city of Ionia was assaulted while alone near his home with a club or other heavy instrument and mortally wounded. He was shortly thereafter

found in a helpless condition by a neighbor whose wife's attention had been attracted by some unusual noise or outcry in that direction causing him to go over and investigate.    He took Smary into his shanty and temporarily cared for him.    Medical aid was summoned and a relative notified.    He lingered in an unconscious condition until November 29th when he died of his injuries.    The physician called to attend him testified he had received three severe blows upon his head "with some club," one over the left eye and two on the back of his head, fracturing his skull both at the front and back which punctured his brain and caused his death.

Deceased was 70 years of age, owned some real estate, including a house occupied by a tenant, and was in the habit of carrying sums of money in a small bag or sack upon his person inside of his overalls and pinned to his underclothing as certain parties who had long known him testified.    No money was found upon him when undressed and cared for after the assault.    He had for some time been an employee at the Ionia pottery where defendant also worked. There was testimony that defendant knew of deceased's habit of carrying money, and not long before his death during a "war drive," when a rally was held at the pottery to obtain subscriptions from the employees, he stood close to deceased as he took out a roll of bills from the sack pinned to his underclothes and contributed from it $10 to the cause.

As soon as advised of the assault, local officers instituted an active investigation to obtain some clue to the perpetrators of the crime, and the prosecuting attorney soon engaged the services of a detective agency.    Their investigations resulted in the arrest of defendant and two confederates named Charles and Edward Ward.    Ultimately confessions were obtained from the three men, reduced to writing by or under

the direction of the prosecuting attorney and signed by them. They waived preliminary examination in justice's court, were held to the circuit court of Ionia county for trial, and jointly informed against under an information containing four counts varying in form but all primarily charging murder. Counsel was appointed by the court to represent them. On arraignment in the trial court the three defendants pleaded guilty. They were then privately interviewed by the court as required by statute and testimony of numerous witnesses was taken before the court for the purpose of determining the degree of the crime. Defendant then voluntarily took the stand and gave his version of the transaction at length. The two Wards affirmed their pleas of guilty and were sentenced without any unusual incident. Defendant was also sentenced, but, when called up for that purpose and asked the usual question, claimed he did not understand the nature of the charge in the information, or the explanation made to him by the judge or attorney assigned to represent him, finally saying he was not guilty and desired "to have a jury or a trial." The circumstances attending his sentence appear in *People v. Utter*, 209 Mich. 214, where it was held that his withdrawal of the plea of guilty before sentence should have been recognized, and the case was remanded for trial. It was thereafter tried out in the circuit court before a jury which found defendant "guilty of murder in the first degree."

The points relied on under defendant's numerous assignments of error are stated in his counsel's brief as follows:

"(1) Errors in the admission and rejection of testimony.

"(2) Errors in the charge of the court given *sua sponte*.

"(3) Errors in the prejudicial remarks and argument of the prosecutor."

Under the first point, error is strenuously urged against admission of the written confessions of Utter and his confederate Charles Ward, on the ground that they were not voluntary but secured by "third degree" methods, "after hours of grilling." The infirmity of this contention rests chiefly in the facts. The Ward brothers were produced as witnesses upon the trial, and defendant took the stand as a witness in his own behalf. The Wards told the story of their participation in the crime with Utter and the part each took in it substantially as stated in Charles Ward's written confession, which there was evidence Utter heard read and affirmed, with certain modifications. Edward Ward's confession was not in evidence. Neither of them made any claim that his confession was procured by fraud, deceit, intimidation, threats, promises or third degree methods. Nor did defendant. His direct testimony was confined to denials with an account of where he was and what he did on the night when the crime took place, while on cross-examination he denied in effect making any confession, and the truth of its contents when examined in detail upon it, asserting he had no recollection of having made or signed it, and refused to recognize his signature to it, which others who saw him sign testified to. The prosecuting attorney, sheriff and others present when the confessions of these men were made and reduced to writing all testified that the prosecuting attorney fully cautioned and advised each of his constitutional rights; that he could not be compelled to give testimony or make any statement against himself, asking each in substance if he desired of his own free will to state his connection with the affair under investigation without any oppression, or promises as to the final disposition of his case, which each answered in the affirmative before his statement was taken.

It was shown that Charles Ward was first placed in jail charged with a different and minor offense while a detective named Brown was put in jail with him under the charge of being a bootlegger, resulting in confidential relations between them under which Brown planned the robbery of a store with Charles Ward's assistance which it is claimed, without going into details, caused or contributed to the latter's confession.   His was the first made, and it is insisted that proof of these confessions was incompetent because secured by trickery and fraud.   There was no proof or claim of any promises by Brown tending to induce a false confession.

"The fact that a confession was procured by the employment of falsehood by a police officer, detective or other person does not alone exclude it; nor does the employment of any artifice, deception or fraud exclude it, if the artifice or fraud employed was not calculated to procure an untrue statement." 12 Cyc. p. 476,—citing numerous cases.

*Vide,* also, *People* v. *Dunnigan,* 163 Mich. 349 (31 L. R. A. [N. S.] 940) ; *People* v. *Barker,* 60 Mich. 277 (1 Am. St. Rep. 501).

But beyond that, Utter had no knowledge of the claimed trickery practiced on Charles Ward.   There is no evidence of any trickery or third degree methods as to him.   Although he was, on December 10th, called to the prosecuting attorney's office and interrogated upon the subject and his relations with the Wards, his statement being taken by a clerk in shorthand, he gave sufficiently plausible answers as to his whereabouts when the crime was committed to divert any suspicion from him at that time and he was not arrested until Charles Ward told the story of the crime on the night of December 31, 1918.   While the latter's statement was being taken in the prosecuting attorney's office that night, officers were sent to the

village of Lyons for defendant.    They arrived there
and arrested him some time after midnight and be-
fore 2 o'clock, telling him in reply to his question of
what he was wanted for that it was for helping the
Ward boys kill Smary, to which he replied with an
oath he guessed they would have to prove it.    After
they had driven for some distance with little said he
asked what made them think he had anything to do
with the Smary murder, to which one of the officers an-
swered:    "The boys claim you killed the old man."
To which he replied:    "It's a damned lie; Ed. done
it."    These officers asked him no questions, but took
him to the prosecuting attorney's office in Ionia where
he was alone in a room with a detective named Hal-
loran for about ten minutes, as the sheriff testified.
Defendant said of this that they talked for "half or
three-quarters of an hour," but he did "not recall what
was said by the detective or what took place" and made
no claim of threats or promises then, or that he was not
advised of his rights.    Halloran testified that when
in the room with Utter he inquired if he knew any-
thing about the Smary murder, telling him before he
made any statement that he need not do so unless
he wished, that he could not promise him anything if
he did, but it would be up to the court and any state-
ment he made might be used as evidence; that Utter
said he was willing to make a statement and the
prosecuting attorney was called, who further fully
advised him of his rights before all of them and Utter
said:    "I am willing to tell you all about it."

There is practically no conflict in the testimony as
to what occurred when defendant's confession was
taken.    The only evidential element suggesting an
issue on whether his statement was freely and volun-
tarily made is his denial of knowledge and asserted
lack of recollection of having made or signed it.

Assuming that created a tangible doubt, it was yet proper for the court to admit defendant's statement and leave the question to the jury under proper instructions. *People* v. *Biossat*, 206 Mich. 334. Yielding to defendant's contention that there was sufficient doubt upon this point to raise an issue of fact, the court left it to the jury with full instructions, including two requests on the subject tendered by defendant's counsel. The first introductorily advised the jury that "there are many cases where the prisoner may be induced through motives of hope or fear to make an untrue confession and the evidence of confessions is subject in a remarkable degree to the imperfection attaching to hearsay," followed by comprehensive instructions in detail as to the law upon the subject, presenting suggestive aspects in language of his counsel's choosing not unfavorable to defendant. The second request, several times shorter and more concise than the first, is as follows:

"No confessions or admissions of respondent are admissible in evidence unless made freely and voluntarily and not under the influence of promises and threats. A confession forced from the mind by the flattery of hope or the torture of fear comes in so questionable a shape when it is to be considered as the evidence of guilt that no credit ought to be given to it and therefore it is rejected."

We are well satisfied defendant's rights were fully safeguarded in the matter of confessions.

Error is assigned and argued on the court permitting indorsement of the names of Charles Murray and Pearl Blough on the information as rebuttal witnesses after defendant rested on a showing by the prosecuting attorney that the importance of their testimony was not known until defendant had testified. Murray was not thereafter called as a witness, but Pearl Blough, a stenographer in the prosecuting at-

torney's office, was sworn and permitted against objection to identify defendant's statement of December 10th which she testified was taken in shorthand and typed by her, read over to and signed by him.    The statement was then offered in evidence by the prosecuting attorney and admitted by the court against objection.    The substance of counsel's contention against this proceeding and testimony is that the prosecutor previously knew those facts which, so far as material, were a substantive part of the people's evidence and not rebuttal.    That statement was not in harmony' with the theory of the prosecution or with defendant's testimony in certain particulars at the time he was upon the stand in his own defense, and he denied making any such statement in the prosecuting attorney's office when asked about it.    It was competent in rebuttal and by way of impeachment to prove and introduce it in evidence.    Defendant's further assignments of error against the testimony of other witnesses called in rebuttal, on the ground it was not proper rebuttal, need not be reviewed in detail.    It mostly related, directly or indirectly, to new facts testified to by him with denial or qualification of facts shown by the prosecution, to conform with the theory of the defense.

Rebuttal evidence is broadly defined as that given by one party to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same.    In practical application the line of demarcation between rebuttal evidence and that which should properly be given in chief before the prosecution rests is frequently more or less obscure, and it is a general rule that whether evidence which could have been offered before resting may be given in rebuttal is a matter within the discretion of the trial court.    *People* v. *Wilson*, 55 Mich. 506; *Chase* v. *Lee*, 59 Mich. 237; *People* v. *Maun-*

*ausau,* 60 Mich. 15; *Meade* v. *Bowles,* 123 Mich. 696;
12 Cyc. p. 557, and cases there cited. The testimony
permitted in rebuttal here was comparatively short
and of minor importance on the controlling issues in
the case. In allowing it we find no abuse of dis-
cretion.

Many errors are assigned against portions of the
charge which assume a different aspect in the light of
the charge taken in its entirety, and call for no se-
rious consideration. The lengthy charge carefully
details the rights of defendant, and very fully in-
structs the jury upon the various principles of law
which they should bear in mind in deciding the facts.
Much of it consists of requests tendered by defendant's
counsel, given verbatim in whole or in part. Eleven
of defendant's requests are given in full and others in
substance. Certain excerpts selected from the charge
standing alone might demand consideration, but, when
read with their context in the light of the testimony,
become unobjectionable. An excerpt from the charge
given at conclusion of a given request of defendant,
to the effect that a truth by a detective "is just as
good as the truth from any other source," is em-
phasized as prejudicial because tending to convey
to the jury the idea that "even though this witness
was a detective he was telling the truth." The re-
quest and court's added reflection run together as
follows:

"You are instructed that in weighing the testimony
of the witnesses termed as detectives in this case you
should scrutinize their testimony with great care and
caution as they are hired witnesses and under pay, and
after so considering their testimony give it just such
weight as you believe it to be entitled to in view of
all the circumstances surrounding the case. [*The
Court*]: If they have testified to the truth it is just
as good as the truth from any other source."

After thus selecting out and cautioning against

witnesses of that calling, we discover no error in the axiomatic assurance to the jury that if they did, after scrutinizing their testimony with great care, find any of that class of witnesses telling the truth they might believe them.

Defendant's assignment number 23 charges prejudicial error in not submitting to the jury the various lesser offenses covered by a charge of murder in the first degree. Near the close of the case the court instructed the jury relative to the offense charged and covered by the evidence for their consideration as follows:

"If it is true as the people claim in this case that he assisted in taking the money from the body that lay there and that later it was divided up between the parties with his knowledge and consent, and that this man was struck and given a mortal wound and died from the effects of it, and that mortal wound was given at the hands of either of the three, if you are satisfied beyond a reasonable doubt of those elements it is your duty to convict the respondent in this case of murder in the first degree. If you are not satisfied beyond a reasonable doubt of his connection with this so far as entering into an agreement to go there with them and assist in its execution your verdict in this case will be not guilty."

Earlier in the charge the court had fully explained to the jury the elements of robbery and murder as defined by statute, and reiterated in varying language the rules in criminal cases as to presumption of innocence, burden and amount of proof required to justify conviction, beyond all reasonable doubt, and in the paragraph immediately preceding the above instruction again cautioned the jury as follows:

"So, gentlemen, in order to convict in this case you must be satisfied beyond a reasonable doubt from all the evidence that the respondent entered into an agreement or conspiracy with the two Ward boys to go and execute the crime of robbery upon John Smary

before the time that the blow was struck that killed him, and that he took part in the execution of the crime of robbery by going there with them."

Defendant's counsel apparently relies on the general rule that where there are different grades or degrees of the offense a charge of the greater in the information includes the less, and failing to find all essentials of the greater proven a jury may convict of the lesser. In such case, however, the facts necessary to constitute the lesser offense must be proven.

While murder is defined by statute in this State, and the killing of a human being under specified circumstances made murder in the first degree, it also includes the common-law definition and, where appropriate, a simple information charging the common-law essentials of murder may be laid, and the jury convict of any degree which the proof establishes.

Our statutory definition of murder in the first degree is as follows (3 Comp. Laws 1915, § 15192):

"All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder in the first degree, and shall be punished by solitary confinement at hard labor in the State prison for life."

The crime charged in this case is that of killing John Smary, "committed in the perpetration" of robbery, and the proofs are confined to that charge. That he was so killed is not disputed by defendant. His claim is that he was not a party to the crime. In *People* v. *Repke*, 103 Mich. 459, where the proofs showed a killing perpetrated by lying in wait pursuant to a preconceived plan to take human life, it was held not error to instruct the jury that if respondent was guilty at all he was guilty of murder in the

first degree.  In *People* v. *Nunn,* 120 Mich. 530, where the evidence was directed to showing the accused induced another by promise of reward to lie in wait and commit homicide, it is said, citing the *Repke Case:*

"The jury were left to determine his guilt, or innocence, and the court properly instructed them that, if they found him guilty, it must be of murder in the first degree."

It is true these are not cases of murder while perpetrating robbery, but murder in the first degree so committed, as defined by statute, does not even include the element of a premeditated or directly intended killing, which seems to yet more restrict the range of legitimate inquiry and inference.

In *State* v. *Zeller,* 77 N. J. Law, 619 (73 Atl. 498), defendant was charged with murder while perpetrating robbery under a like statute with ours.  A statute of that State also provided as here that if the jury found the accused guilty of murder they should ascertain the degree.  In a well reasoned opinion it was held that the latter provision did not give a defendant the right to have the court leave it to the jury to find him guilty of a lesser degree if there was no reasonable ground for such verdict in the evidence, saying in part:

"Our statute declares that murder committed in the perpetration or attempt to perpetrate a robbery is murder in the first degree.  All the evidence that tended to implicate Zeller in the murder of William Read (including Zeller's own confession) tended to show that the murder was committed in the perpetration of a robbery.  All the circumstances of the homicide bore a similar import as to the character of the crime.  If under the evidence, Zeller was guilty at all, he was guilty of a murder committed in the perpetration of a robbery.  The charge of the trial judge upon this question was therefore entirely proper."

In *People* v. *Schleiman,* 197 N. Y. 383 (90 N. E. 950, 27 L. R. A. [N. S.] 1075, 18 Ann. Cas. 588), defendant was convicted under a similar statute of murder while perpetrating burglary. The court there held that under such a statutory charge, with the proofs limited to it,—

"there was no room for the exercise of a power to find the defendant guilty of a lesser degree of felonious homicide depending upon the existence or nonexistence of deliberation and premeditation. Hence, the learned trial judge committed no error in refusing to charge in reference to the various degrees of crime in this case or in instructing the jury that they must find the defendant guilty of murder in the first degree, or not guilty."

In *Essery* v. *State,* 72 Tex. Crim. Rep. 414 (163 S. W. 17), the proposition is tritely stated as follows:

"When the code said that murder committed in a certain way was murder of the first degree, the law so makes it, and the jury by their verdict could not find otherwise."

While the authorities in other jurisdictions are not entirely harmonious upon this question we think sound reasoning supports the foregoing views, to which this court is in effect committed. Defendant was charged with statutory murder, committed by acts and under circumstances declared by statutory definition to constitute murder in the first degree, to which the testimony was confined with no evidence from which a reasonable inference of any other degree could be drawn. He was entitled to acquittal if the charged murder in the first degree was not proven to the satisfaction of the jury. Under the testimony in this case the court committed no error in instructing the jury that their verdict should be murder in the first degree, or not guilty.

It is contended by his counsel that defendant might

have been convicted under the evidence of a lesser crime on the following theory:

"If the respondent did not know that he was to participate in a robbery at the time the blow was struck by the witness Ward, but supposed as he testified that he was simply going with them on some innocent mission, even though he participated in taking the money from the body of the deceased, he would not be guilty of murder in the first degree; he would simply be guilty as an accessory after the fact."

No requests were tendered for instructions on that theory, nor was it called to the attention of the trial court so far as shown, but if by any process of construing the testimony an inference along that line of thought were possible the charge disposed of it in defendant's favor, by instructing the jury that to convict they must find defendant entered into a conspiracy, or agreement, with the Ward boys before the time the blow was struck which killed Smary to go and execute the crime of robbery upon him, and if they were not satisfied beyond a reasonable doubt "of his connection with this so far as entering into an agreement to go there with them and assist in its execution" their verdict should be not guilty.

An examination of defendant's various other assignments of error leads to the conclusion they are not well founded and their discussion would serve no useful purpose.

The conviction will stand affirmed.

WIEST, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.   MOORE and FELLOWS, JJ., did not sit.