PEOPLE v McGILLEN #1

OPINION OF THE COURT

1. CRIMINAL LAW—CONFESSIONS—ADMISSIBILITY—VOLUNTARINESS—
   APPEAL AND ERROR.

   The sole purpose of a hearing regarding the admissibility of a
   confession is to determine the fact of voluntariness of state-
   ments of a person accused of crime and a reviewing court is
   concerned only with the correctness of that determination; a
   reviewing court is required to examine the entire record and
   make an independent determination of the ultimate issue of
   voluntariness; if after such a review the Michigan Supreme
   Court does not possess a definite and firm conviction that a
   mistake was committed by the trial judge in his ruling, it will
   affirm that ruling.

2. CRIMINAL LAW—MIRANDA WARNINGS—ATTORNEY AND CLIENT.

   Once *Miranda* warnings have been given, the subsequent proce-
   dure is clear; if the individual indicates in any manner, at any
   time prior to or during questioning, that he wishes to remain
   silent, the interrogation must cease; if the individual states
   that he wants an attorney, the interrogation must cease until
   an attorney is present and, at that time, the individual must
   have an opportunity to confer with the attorney and to have
   him present during any subsequent questioning; if the individ-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 16] 29 Am Jur 2d, Evidence §§ 523–596.
[3, 4] 29 Am Jur 2d, Evidence §§ 613, 614, 640, 644.
[5] 29 Am Jur 2d, Evidence § 614.
[6] 21 Am Jur 2d, Criminal Law § 328.
[7, 12, 19, 20] 29 Am Jur 2d, Evidence §§ 687, 689–691.
[8, 11, 13] 30 Am Jur 2d, Evidence § 1082.
[9] 21 Am Jur 2d, Criminal Law § 93.
[10] 65 Am Jur 2d, Rape §§ 70, 71.
[14] 30 Am Jur 2d, Evidence § 1086.
[15] 65 Am Jur 2d, Rape § 3.
[17] 30 Am Jur 2d, Evidence §§ 1082, 1087, 1124.
[18] 21 Am Jur 2d, Criminal Law §§ 440, 441.
[21] 65 Am Jur 2d, Rape § 2.

ual cannot obtain an attorney and he indicates that he wants one before speaking to the police, they must respect his decision to remain silent; if the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

3. CRIMINAL LAW—STATEMENTS—ADMISSIBILITY—POLICE—EVIDENCE.

Only a *defendant's* statements may be admissible against him, not an arresting officer's editorialized version of them.

4. CRIMINAL LAW—POLICE—WITNESSES.

The police are not advocates in a criminal prosecution and, upon taking the witness stand in a criminal trial, their fealty is to our system of justice, not to the prosecutor's office or to the defense attorney; their only obligation is to tell the truth, *the whole truth,* and nothing but the truth.

5. CRIMINAL LAW—STATEMENTS—WAIVER—BURDEN OF PROOF—CONSTITUTIONAL LAW—APPEAL AND ERROR.

Statements given by the defendant charged with a crime were involuntary and reversible error was committed when they were introduced at trial where the burden on the government to show that defendant knowingly and intelligently waived his constitutional rights was not met.

6. CRIMINAL LAW—WITNESSES—INDORSED WITNESSES—INDICTMENT AND INFORMATION.

A defendant has a right to know in advance of the trial what witnesses are to be produced against him, so far as then known, and to have any new witnesses indorsed on the information as soon as discovered; the object of this is not merely to advise a defendant what witnesses will be produced on the main charge, but also to guard him against the production of persons who are unknown, and whose character he should have an opportunity to investigate.

7. CRIMINAL LAW—EVIDENCE—REBUTTING EVIDENCE.

Dividing up the testimony on which the people propose to rest their case is not proper, and nothing which tends to prove the commission of the crime itself or its immediate surroundings can be classed as rebutting evidence under ordinary circumstances, if at all.

8. WITNESSES—EVIDENCE—CROSS-EXAMINATION.

A party is free to contradict the answers which he has elicited from his adversary or his adversary's witness on cross-examination as to matters germane to the issue; as a general rule, a witness may not be contradicted as to collateral, irrelevant, or immaterial matters, and, accordingly, subject to some qualifications, where a party brings out such matters on cross-examination of his adversary's witness, he may not contradict the witness' answers.

9. RAPE—STATUTORY RAPE—EVIDENCE.

Evidence as to the amount of force the prosecutrix could reasonably have been expected to put forth in resistance to an alleged forcible rape is material where the prosecution must prove forcible rape, but it would not be true in a statutory rape prosecution.

10. RAPE—EVIDENCE—WITNESSES.

Testimony that defendant on more than one occasion struck some of his children did not fall within the rationale proposed by the prosecutor for the introduction of such evidence, that it was relevant to the amount of force the prosecutrix could reasonably have been expected to put forth in resistance to the alleged forcible rape by her father.

11. RAPE—EVIDENCE—RELEVANCY—ADMISSIBILITY.

To contradict the testimony of the defendant as to whether or not he ever struck the prosecutrix, and, by so showing, introduce evidence tending to show the state of mind of the prosecutrix at the time of an alleged forcible rape by her father would be relevant; any fear which the prosecutrix had of her father would be relevant on the question of the amount of resistance she could be expected to put forth to her father's advances and it might also be relevant to show that defendant has struck other members of the family, but only so far as that act was committed in the prosecutrix's presence, or was in some way communicated to her and had some effect on her mental attitudes towards resisting her father's will but without this vital connective link, this rebuttal testimony becomes collateral to the issue being tried and inadmissible.

12. CRIMINAL LAW—REBUTTAL TESTIMONY—PROBATIVE VALUE—PREJUDICE.

Trial judge, when the proper objections are raised, should consider whether or not any probative value rebuttal testimony may have is outweighed by the inherent prejudice to the defendant charged with a crime and if so, exclude it from

testimony where the nature of the rebuttal testimony itself is inherently inflammatory and prejudicial.

13. WITNESSES—EVIDENCE.

Generally, the only type of contradictory evidence that is admissible is that which directly tends to disprove the exact testimony given by a witness.

14. CRIMINAL LAW—EVIDENCE—NEW TRIAL.

Michigan Supreme Court need not now decide whether there was sufficient evidence to convict where a new trial is already mandated.

15. RAPE—PENETRATION—INSTRUCTIONS—APPEAL AND ERROR.

Reversible error was committed when the trial judge failed to include in his instruction one essential element of the crime of forcible rape, that is penetration.

DISSENTING OPINION

M. S. COLEMAN and J. W. FITZGERALD, JJ.

16. RAPE—STATEMENTS—VOLUNTARINESS—MIRANDA WARNINGS.

*Trial judge properly ruled voluntary the remarks of a defendant, who was charged with the forcible rape of his daughter and stated to an officer that he was "only trying to help her so she will be ready when she begins dating boys", where the officer read the* Miranda *warning to defendant, asked "do you wish to talk to us now" and, at that time, the defendant indicated that he would talk although defendant at a second hearing testified that he did not understand the* Miranda *warnings because, after defendant's alleged statement he said he wanted an attorney thereby invoking his rights.*

17. CRIMINAL LAW—CONFLICTING TESTIMONY—QUESTION OF FACT.

*A conflict between testimony of a defendant and a police officer is properly a question for the trier of fact.*

18. CRIMINAL LAW—WALKER HEARING—APPEAL AND ERROR—CLEAR ERROR.

*A* Walker *hearing determination cannot be overruled unless it is shown that the trial court's determination was clearly erroneous.*

19. RAPE—REBUTTAL TESTIMONY—DISCRETION.

*Testimony which was allowed into evidence was proper rebuttal and the trial judge did not abuse his discretion in allowing the testimony to come before the jury where defendant was*

*charged with the forcible rape of his daughter and the proof of resistance was relevant as was the daughter's cause to fear defendant, the daughter testified in the case in chief that defendant had on many occasions struck her, that he had struck his other children, that she was afraid of him, defendant denied this, the daughter also testified that when she showed her mother the skirt a brother and sister were there and she said, "see what he's done now" and the mother denied this because the brother's testimony contradicting the mother and that he had seen the defendant on more than one occasion strike some of his children was relevant, goes to the credibility of the witnesses, was properly confined to matters brought forth in the case in chief and the "connective link" is apparent; the same is true of other rebuttal witnesses who testified as to "spankings".*

20. TRIAL—EVIDENCE—REBUTTAL—DISCRETION.

*Generally, whether evidence which could have been offered before resting may be given in rebuttal is a matter within the discretion of the trial court.*

21. RAPE—CARNAL KNOWLEDGE—SEXUAL CONNECTION—PENETRATION —INSTRUCTIONS.

*Terminology such as "carnal knowledge" and "sexual connection" fulfills the requirement of an instruction upon penetration in a rape case.*

Appeal from Court of Appeals, Division 3, R. B. Burns, P. J., and Holbrook and O'Hara, JJ., affirming Bay, Arthur E. Moore, J. Submitted March 13, 1974. (No. 1 March Term 1974, Docket No. 54, 319.) Decided August 2, 1974. Rehearing denied September 12, 1974.

William P. McGillen was convicted of rape. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Eugene Penzien,* Prosecuting Attorney, and *Prosecuting Attorneys Appellate Service* (by *Howard C. Marderosian),* for the people.

*Jerome F. O'Rourke (Carl H. Leiter,* of counsel)
for defendant on appeal.

T. M. KAVANAGH, C. J. Defendant is over 60
years of age. It is alleged that on two separate
occasions, May 23, 1970 and May 31, 1970, he
raped[1] his 15-year-old daughter, Barbara Jean Mc-
Gillen.

He was first tried and convicted of the May 31,
1970 offense by a jury. Subsequently, a different
jury also found him guilty of the May 23, 1970
offense. Defendant separately appealed both con-
victions.

On its own motion, the Court of Appeals consoli-
dated both cases for hearing on the merits. They
subsequently affirmed both convictions in an un-
published opinion, Docket Nos. 11802, 13077, July
27, 1972. This Court granted leave to appeal in
both cases, 388 Mich 801 (1972), and they were
jointly briefed and argued. To properly identify
and discuss the different issues raised in each case,
this Court will rule on each case by separate
opinion. The following will deal with the defend-
ant's first conviction, based on the May 31, 1970
offense.

## *ISSUE I*

During the trial of this case, the prosecution put
on the stand the arresting officer. The officer
sought to testify as to statements made by the
defendant at the time of his arrest. A *Walker*[2]
hearing was held by the trial judge and the state-

[1] MCLA 750.520; MSA 28.788.

[2] *People v Walker* (on rehearing), 374 Mich 331; 132 NW2d 87
(1965).

ments given by the defendant were ruled to have been voluntary. The defendant challenges this finding.

As this Court stated in *People v Robinson,* 386 Mich 551, 557; 194 NW2d 709 (1972), "the sole purpose of the *Walker* hearing is to determine the fact of voluntariness and a reviewing court is concerned only with the correctness of that determination. * * * 'On this appeal we are required to "examine the whole record and make an independent determination of the ultimate issue of voluntariness." ' "

If after such a review we do not possess a definite and firm conviction that a mistake was committed by the trial judge in his ruling, we will affirm that ruling. *People v Hummel,* 19 Mich App 266; 172 NW2d 550 (1969).

The *Walker* hearing in this case was held on February 19, 1971. At that time the arresting officer testified that he first learned of this alleged incident on the morning of June 6, 1970. At approximately 8:00 that morning, he received two telephone calls, the first from Mr. Porsche, the family with whom the prosecutrix was staying at the time, and the second from the wife of the defendant. Both requested that he come out to the Porsche residence. He also testified this was his first dealing with this case.[3]

The officer then stated that when he arrived at the Porsche residence he spoke briefly with Mr.

---

[3] On June 3, 1971, at which time a second *Walker* hearing was held prior to the second trial for the May 23, 1970 offense, the officer recanted this testimony. On this date he testified that he first learned of this alleged crime on the evening of June 5, 1970. At that time he received a telephone call from another officer who had interviewed Barbara McGillen that evening and asked him to look into the matter.

Porsche.[4] He then had the defendant enter his car at which time he read to the defendant his *Miranda*[5] rights from a printed card. He then testified that the defendant agreed to waive these rights, and upon questioning the following dialogue took place.

"*Q.* What questions did you ask about this incident?

"*A.* I asked direct questions—whether or not he had sexual intercourse with his daughter Barbara and his answer to that was—no.

"*Q.* Did you ask him anything else?

"*A.* I asked if he attempted to have sexual intercourse with Barbara and his answer to that was no also.

"*Q.* Did you ask him anything else?

"*A.* Then I asked if he had done anything at all with his daughter Barbara that might be considered indecent and he made the statement he was trying to help her so she would be ready when she started dating boys."

The officer then testified that he spoke briefly with Barbara McGillen and later her mother. He then placed the defendant under arrest and proceeded to drive the 17–18 miles to the State Police Post. Shortly after leaving the Porsche residence, the officer stated that the defendant told him he wanted an attorney. The officer also testified as follows:

"*Q.* You never discussed anything about this case after he told you he wanted to call me or an attorney?

"*A.* I may have asked him questions knowing I would not be able to use the answers.

---

[4] During the second *Walker* hearing, the officer testified that this conversation included no mention whatsoever of the crimes alleged in these cases.

[5] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694, 10 ALR3d 974 (1966).

"*Q*. But from the answers you could lead to other things?

"*A*. It might.

"*Q*. Even if you could not use the answers, is this correct?

"*A*. It is theoretically possible.

"*Q*. Not theoretically possible, it is very possible if you ask the questions and know you could not repeat the answers to that question, it could lead to something else.

"*A*. It could—yes.

"*Q*. In spite of the fact he said he wanted to speak to an attorney, you continued questioning him, is that correct?

"*A*. I am sure I must have asked him questions, some questions about the matter. * * *

"*Q*. Were any questions asked him at the State Police Post in Bay City?

"*A*. I probably asked him more questions there, yes.

"*Q*. You asked him more questions there?

"*A*. Yes.

"*Q*. What questions did you ask him there?

"*A*. I don't recall exactly. He had indicated he had an attorney, he had in fact, called you upon our arrival at the post.

"*Q*. What questions did you ask him while at the post?

"*A*. I don't recall.

"*Q*. Did you ask him any questions about this incident at the post?

"*A*. I probably did—yes.

"*Q*. But you don't know what they were?

"*A*. They would have been of a general nature.

"*Q*. You don't know what they were?

"*A*. No."

The defendant did not testify during the first *Walker* hearing. At the second *Walker* hearing he gave the following version of the arrest and questioning.

Defendant states that when the officer arrived he spoke briefly to himself and Mr. Porsche. Neither conversation was about the alleged incidents. The officer spoke with Barbara and Mrs. McGillen, then called him over to the car and placed him under arrest. Defendant then testified:

"*Q.* Where were you when he asked you whether or not you ever had intercourse with your daughter Barbara?

"*A.* We was on the road, started down the road.

"*Q.* Where were you when he asked any of the questions?

"*A.* About Barbara Jean—we was on the road.

"*Q.* Where were you when he first told you of your right to have an attorney?

"*A.* On the road—he looked for the card in the yard and did not have one, he looked around the car, got in the car and started talking about the rights—you can have an attorney appointed.

"*Q.* You were aware of that at Porsche's or on the road?

"*A.* On the road.

"*Q.* Where were you when you told him about you were taking Barbara to dances and to various places so she would get acquainted and get ready for dating boys?

"*A.* On the road."

The defendant further testified that he did not understand what the officer said and did not know if he had to answer these questions. He further testified:

"*Q.* Did you ever make a statement to him, in answer to any question, that you were only trying to help her?

"*A.* Not the way he told it in court. He told it in court that I admitted having intercourse with her and I never done no such thing, I told him. We was—he was talking all the way bribing me all the way down about laying blocks and asking what I was doing, how many blocks can you lay and I told him I have laid 700 after

dinner. He said, I am a block layer, a much bigger man
than you are. He said, I can't do it. I did not tell him,
he ain't got the move to lay blocks, but I didn't. I said,
we had taken her out twice a week, Marie and I had
taken her out to a fish supper and dance once a week
over a year, to have her meet people, the young genera-
tion, so she would be ready to meet the people and the
boys.

"*Q.* Is—this is what you told him?

"*A.* That's right."

When questioned about the exact nature of the
response given by the defendant to the third in-
criminating question, the officer testified at the
first *Walker* hearing as follows:

"*Q.* That was his only reply to that question?

"*A.* Yes.

"*Q.* You never asked him any other questions regard-
ing this after that?

"*A.* I am sure I asked those three key questions
several times and I always got the same answer.

"*Q.* You always got the same answer?

"*A.* Yes."

However, on this crucial point, the officer's testi-
mony at the second *Walker* hearing again changes
to the following:

"*Q.* You merely asked and got an answer to that
question of what?

"*A.* It wasn't a direct answer—he said, he was trying
to help her.

"*Q.* Not a direct answer—he was trying to help, in
what way?

"*A.* So she would be ready when she started dating
boys.

"*Q.* Did you ask what he meant by that question—
that answer?

"*A.* I believe I did.

"*Q.* What did he say he meant by it?

"*A.* I don't recall if he explained exactly what he meant by it.

"*Q.* Did you ask any further questions?

"*A.* I asked a lot of questions—I asked him quite a number of questions."

The law in this state was expressed by the United States Supreme Court in *Miranda, supra,* pp 473–475:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. * * *

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v Illinois,* 378 US 478, 490, n. 14 [84 S Ct 1758; 12 L Ed 2d 977 (1964)]."

See also, *People v Tubbs,* 22 Mich App 549; 177 NW2d 622 (1970); *People v Matthews,* 22 Mich App 619; 178 NW2d 94 (1970). In this case the

arresting officer admits that the defendant requested an attorney and that he continued to question the defendant although he knew that such action was impermissible. Fortunately for the police, however, the defendant's incriminating answer to the officer's third question was given prior to his request for counsel. Defendant asserts that the warnings were unclear to him, he did not understand them, and that these questions were asked after he requested counsel. Simply put, the question is who is this Court to believe.

As shown in the above excerpts from the transcripts, the incriminating answer itself is highly ambiguous and in dire need of explanation. During the first trial, the officer testified that this was a direct statement given by the defendant in response to a direct question. Moreover, the same highly ambiguous, unresponsive answer was repeated several times. Yet upon the second trial, we learn such is not the case. The officer now admits the answer was unresponsive and in need of an explanation, even to him. He admits he continued questioning to ascertain what the defendant meant by this statement. He never does tell us what the response was. Why was this crucial fact not revealed *at all* during the first prosecution? It now appears that the defendant's definite, repetitive, concrete response may in reality be nothing more than the officer's repeated paraphrase of the entire conversation. This is not what the officer was asked. He was not asked to capsulize the conversation and give his synopsis. He was asked what the defendant said. It is only the *defendant's* statements that may be admissible against him, not the arresting officer's editorialized version of them.

Suffice it to say, that the officer's testimony, taken as a whole, shows not only a deliberate

attempt on his part to by-pass the mandates of *Miranda,* but also reveals a lack of candor with the court, the attorneys and to our system of jurisprudence. The police are not advocates in a criminal prosecution. They contribute a vast service to society by investigating crime, apprehending the guilty, and by protecting the innocent. Far too often they are not given the praise and the honor due them. However, upon taking the witness stand in a criminal trial, their fealty is to our system of justice, not to the prosecutor's office or to the defense attorney. Their only obligation is to tell the truth, *the whole truth,* and nothing but the truth.

As *Miranda, supra,* dictates, the burden rests on the government to show that the defendant knowingly and intelligently waived his constitutional rights. We do not feel that burden has been met in this case. We accordingly hold that the statements given by the defendant were involuntary and reversible error was committed when they were introduced at trial.

## ISSUE II

After the close of defendant's case, the prosecution called several witnesses to the stand for the purpose of rebutting a portion of the testimony given by the defense witnesses. Defendant now argues that this rebuttal testimony was introduced over the objection of the defendant, was improper, inadmissible, inflammatory, emotionally appealing and unfairly prejudicial.

During cross-examination, the defendant was asked by the prosecutor whether or not he believed in maintaining strict discipline within the family. In connection with this, he then asked whether or not the defendant had ever found it

necessary to spank his children, and in particular, whether he ever struck Barbara McGillen with his hand. The defendant answered no to both questions.

Also, on the cross-examination of Marie Mc-Gillen, defendant's wife, the prosecutor asked whether or not the prosecutrix had complained to her mother about this incident shortly after it happened, and whether or not she had shown the torn skirt to her which had resulted from it. The witness testified that Barbara had not.

### Testimony of Ronald McGillen—

Upon taking the stand, Ronald testified that Barbara came into their home after this incident, told him what had happened, showed him her torn skirt[6] and had also complained to her mother, Marie McGillen. Defendant objected to this testimony on the ground that it was not proper rebuttal evidence and more properly belonged in the prosecutor's case in chief. Ronald then continued to testify that he had seen the defendant on more than one occasion strike some of the children. He then testified specifically as to the beating the defendant allegedly inflicted on Ronald's younger brother on an earlier occasion.

As to defendant's objection that part of Ronald's testimony should have been presented in the prosecutor's case in chief, we feel that the rule expressed by Justice CAMPBELL in *People v Quick*, 58 Mich 321–323; 25 NW 302 (1885) should be controlling in this case. Justice CAMPBELL stated:

"We have held on several occasions that the defend-

---

[6] The complaining witness, Barbara, did not testify as to this conversation or meeting with her brother when she was on the stand. Her testimony could be read as actually negating this meeting with her brother.

ant has a right to know in advance of the trial what witnesses are to be produced against him, so far as then known, and to have any new witnesses endorsed on the information as soon as discovered. The object of this is not merely to advise a respondent what witnesses will be produced on the main charge. It is to guard him against the production of persons who are unknown, and whose character he should have an opportunity to canvass. It is as important to impeach a rebutting witness as any other. In the present case, however, the witnesses who were received as rebutting witnesses were not such. They were called to prove what belonged to the people's case in chief. Cases may sometimes arise where testimony which could not be had in the opening may be let in upon good cause shown thereafter. But it is not proper to divide up the testimony on which the people propose to rest their case, and nothing which tends to prove the commission of the crime itself or its immediate surroundings can be classed as rebutting evidence under ordinary circumstances, if at all. In this case that rule was repeatedly violated."

See also, *People v Rose,* 268 Mich 529, 538–540; 256 NW 536 (1934).

The prosecution should adhere to this rule upon retrial of this case.

The defendant also alleges that the prosecutor's contradiction of his statement that he had never spanked his children, elicited from him on cross-examination, was also improper.

The general rule on this evidentiary question is expressed in 98 CJS, Witnesses, §§ 632, 633. It is there stated:

"A party is free to contradict the answers which he has elicited from his adversary or his adversary's witness on cross-examination as to matters germane to the issue. * * *

"As a general rule, a witness may not be contradicted as to collateral, irrelevant, or immaterial matters, and, accordingly, subject to some qualifications, where a

party brings out such matters on cross-examination of
his adversary's witness, he may not contradict the
witness' answers."

This rule is followed in Michigan. *Driscoll v
People,* 47 Mich 413; 11 NW 221 (1882); *Hamilton
v People,* 46 Mich 186; 9 NW 247 (1881); *People v
Hillhouse,* 80 Mich 580; 45 NW 484 (1890).

The prosecutor argues that this testimony given
by Ronald McGillen and several other of defend-
ant's children is material to the issue being tried,
in that it was relevant to the amount of force the
prosecutrix could reasonably have been expected
to put forth in resistance to the alleged forcible
rape by her father.

This Court agrees that such evidence is material
in that context, where the prosecution must prove
forcible rape, but would point out that it would not
be true in a statutory rape prosecution. We do not
agree, however, that the testimony actually given
by this and several other prosecution witnesses fell
within the rationale proposed by the prosecutor
for the introduction of such evidence.

It would be relevant to contradict the testimony
of the defendant as to whether or not he ever
struck the prosecutrix and, by so showing, intro-
duce evidence tending to show the state of mind of
the prosecutrix at the time of this alleged incident.
Any fear which Barbara had of her father would
be relevant on the question of the amount of
resistance she could be expected to put forth to
her father's advances. It might also be relevant to
show that defendant has struck other members of
the family, but only so far as that act was commit-
ted in Barbara's presence, or was in some way
communicated to her and had some effect on her
mental attitude towards resisting her father's will.

Without this vital connective link, this rebuttal

testimony becomes collateral to the issue being tried and inadmissible.

Also, where the nature of the rebuttal testimony itself, as presented in this case, is so inherently inflammatory and prejudicial, the trial judge, when the proper objections are raised, should consider whether or not any probative value it may have is outweighed by the inherent prejudice to the defendant and if so, exclude it from testimony. This is particularly so where, as in this case, the prosecutor proceeds to question the witness on all the emotionally appealing, prejudicial details of the father's "spanking". These details, it is noted, go beyond simple contradiction of the defendant's testimony in this case. Generally, the only type of contradictory evidence that is admissible is that which directly tends to disprove the exact testimony given by a witness.

The prosecution should bear this in mind on retrial.

*Testimony of Remaining Rebuttal Witnesses—*

Since this case must be remanded for a new trial, this Court need not separately rule on the testimony of the remaining rebuttal witnesses. It is noted, however, that generally the testimony presented violated one or the other of the rules set forth above, and in some instances was rebuttal on a point that this Court might well deem collateral and immaterial, yet highly prejudicial. If the testimony of these witnesses is relevant and material, the prosecutor can introduce it in his case in chief, or in rebuttal in proper form.

## REMAINING ISSUES

The defendant raises several other issues on appeal, not the least of which is the question

whether there was sufficient evidence to convict in this case, which this Court need not now decide because a new trial is already mandated. We would hope that if error was committed, it will be corrected upon retrial of the matter.

We would also point out that in this case the defendant was charged with forcible rape. Yet the jury instruction given by the trial court more appropriately defines the offense of assault with intent to rape. The judge failed to include in his instruction one essential element of the crime of forcible rape, that is penetration. This is reversible error.

Reversed and remanded.

T. G. KAVANAGH, SWAINSON, WILLIAMS, and LEVIN, JJ., concurred with T. M. KAVANAGH, C. J.

M. S. COLEMAN, J. *(affirm)*. I would affirm the conviction of rape by defendant of his daughter and so dissent from the majority opinion.

## FACTS

The facts set forth by T. M. KAVANAGH, C. J., are accurate so far as they go in the initial summary and they are adopted for the purposes of this dissent.

## ISSUE I

Was the *Miranda* waiver voluntary?

The Court has found that defendant's statement was not voluntarily given. This is contrary to the determination of two trial judges who, after conducting hearings as required by *People v Walker,* 374 Mich 331; 132 NW2d 87 (1965), each found defendant's statements to be admissible. I agree

that the testimony in the *Walker* hearings more than satisfies present standards.

Officer Haustein testified that he read the *Miranda* warnings from a card furnished by the Bay County prosecutor's office. He said to defendant:

"You have a right to remain silent; anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements."

Officer Haustein then said:

"Then these questions were asked. Do you understand each of these rights I have explained to you to which I got an affirmative answer. Do you wish to consult with an attorney or have him present during questioning? The answer at that time was no. Having these rights in mind, do you wish to talk to us now? At that time the defendant indicated he would talk to us."

They were sitting in the car during this exchange, according to the officer. This testimony was uncontroverted at the first *Walker* hearing, as was the officer's testimony relative to the only statement which could be construed as damaging to defendant:

"I told him of the allegations that I had been made aware of, allegations made by Barbara McGillen, and I asked him if he had ever actually had sexual intercourse with her and he said no, and I asked if he had tried and he said no. And I asked him if he had ever done anything which could be considered indecent with her and he stated that I am only trying to help her so she will be ready when she begins dating boys."

The trial judge properly ruled the remarks of defendant voluntary.

During trial in the first case, it also should be noted that defendant testified with reference to Officer Haustein:

"*A.* He said, you don't have to talk, he said, unless you want to. He said something else, you have a right to have a lawyer."

However, at the second *Walker* hearing the defendant testified that he did not understand what the officer said (the *Miranda* warnings) and did not know if he had to answer questions.

Importantly, after the alleged statement of defendant while sitting in the car and sometime during the drive to the police station, defendant said that he wanted an attorney. If defendant did not understand his rights, how is it that he later invoked them? See *United States v Hayes,* 385 F2d 375 (CA 4, 1967).[1]

Consideration of the defendant's testimony at the second *Walker* hearing and at the second trial is irrelevant as to the soundness of the finding of the first *Walker* hearing. There is no indication that defendant lacked understanding or otherwise made an involuntary statement in this trial.

Because the *Walker* hearing in the second trial is discussed in *McGillen #1,* it is also discussed here. On the face of the transcript of the second trial, there is a conflict of testimony to be resolved

---

[1] There defendant was given the warning and was permitted to make a phone call, but was never asked if he understood the warning or desired counsel, and he did not volunteer this information. He never confessed but did make some incriminating statements during the 30 minutes of questioning, which he suddenly terminated by declaring he would answer no more questions and demanding that he be allowed to see a lawyer. The Court concluded that this later assertion of his rights made it clear that he understood the warning and knew how to exercise his rights.

by the triers of fact—the judge in the *Walker*
hearing and the jury during trial.

I find no inconsistency in the statements of
Officer Haustein in the two trials although differ-
ent questions were asked of him. I believe criticism
of the officer's testimony to be totally unwar-
ranted.

In response to the question propounded in the
opinion of T. M. Kavanagh, C. J., "who is this
Court to believe?", I suggest that the question is
properly for the triers of fact.

By no stretch of interpretation of the transcript
could I form a "definite and firm" conviction that
a mistake was committed by the trial court[2] and,
therefore, I would find the waiver of *Miranda*
rights to have been voluntarily made.

There also were intimations in the majority
opinion regarding the consequences of *Miranda*
violations. Because they were not directly involved
in the conclusion reached, I reserve judgment as to
that dicta.

## *ISSUE II*

Did the rebuttal testimony of Ronald McGillen
(and others) properly belong in the case in chief?

The testimony which was allowed into evidence
was proper rebuttal.

In *People v Utter,* 217 Mich 74, 83; 185 NW 830
(1921), the Court said:

"[I]t is a general rule that whether evidence which
could have been offered before resting may be given in

---

[2] A *Walker* determination cannot be overruled "unless it is shown
that the trial court's determination was clearly erroneous." *People v
Kelly,* 30 Mich App 154; 186 NW2d 72 (1971). Also *see People v
Johnson,* 33 Mich App 160; 189 NW2d 509 (1971); *People v Gilleylen,*
34 Mich App 393; 191 NW2d 96 (1971); *People v Toneff,* 37 Mich App
221; 194 NW2d 390 (1971).

rebuttal is a matter within the discretion of the trial
court. *People v. Wilson,* 55 Mich. 506 [21 NW 905
(1885)]; *Chase v. Lee,* 59 Mich. 237 [26 NW 483 (1886)];
*People v. Maunausau,* 60 Mich. 15 [26 NW 797 (1886)];
*Meade v. Bowles,* 123 Mich. 696 [82 NW 658 (1900)]; 12
Cyc. p. 557, and cases there cited."

This continues to be the rule. See *People v Delano,*
318 Mich 557; 28 NW2d 909 (1947) and *People v
Daleo,* 43 Mich App 386; 204 NW2d 315 (1972). I
find no abuse of discretion in this case.

Defendant was charged with forcible rape[3] and
the proof of resistance was therefore relevant as
was Barbara's cause to fear defendant.

Barbara McGillen testified in the case in chief
that defendant had on many occasions struck her.
She also testified that he had struck the other
children and that she was afraid of him. This the
defendant denied. He denied that he spanked any
of his children. Barbara also testified that when
she entered the kitchen after the incident, her
mother, brother Ronald and a sister were there.
She showed her mother the skirt and said, "see
what he's done now." The mother denied this.
Ronald's testimony is relevant and goes to the
credibility of the witnesses.

The rebuttal testimony was properly confined to
matters brought forth in the case in chief. (The
judge refused to allow Ronald to testify as to
whatever occurred in the bathroom, because it did
not connect to the case in chief.) The "connective
link" is apparent. (The same is true of the testi-
mony of other rebuttal witnesses who testified as
to "spankings".)

I cannot agree that the rebuttal testimony was

---

[3] The record indicates that the motion to amend the information to
add "under the age of 16 years" after the word "female" was denied
and that the case proceeded on the charge of common-law rape
requiring proof of the utmost resistance.

improper in any way or that the judge abused his discretion in allowing the excised testimony to come before the jury. I further find that the precedent cited is not applicable to these facts.

### Remaining Issue(s)

The majority opinion finds that the jury instruction in *McGillen #1* more appropriately defined the offense of assault with intent to rape rather than the charged forcible rape. With much attention to form over substance, it finds the failure to instruct using the word "penetration" reversible. The following excerpts are relevant:

"The statute in this case made and provided, insofar as it is immediately material to this action before you reads as follows: '*Any person who shall ravish and carnally know* any female by force and against her will, shall be guilty in violation of the law.'

\*   \*   \*

"This is the charge, the defendant did unlawfully and *carnally know* and abuse Barbara Jean McGillen, a female *by force and against her will.* So much for the statute and the information in this cause.

"Now as to the elements I think it is more or less *obvious what has been said up to this point.* The elements of the offense in question are these. These are the elements which the prosecution must have proved beyond a reasonable doubt to your satisfaction if a verdict of guilty is to be rendered. The first element is the element of *criminal intent to rape;* the second element is the element of *assault either by force or by fear of force* and including it being *against the will* of the complaining witness, with *resistance* to the utmost by the complaining witness within the facts and circumstances of the particular case. If all of these elements have been proved to your satisfaction beyond a reasonable doubt, you may bring in a verdict of guilty as charged. If any elements have not been proved beyond

a reasonable doubt to your satisfaction as jurors, then your verdict must be of not guilty.

\* \* \*

*"Rape such as is charged in the information in this cause has been defined to be carnal knowledge of a woman by force and against her will.* As I have said, the statute so far as it is material to this cause reads: 'any person who shall ravish and carnally know any female by force and against her will' shall be guilty.

\* \* \*

"The term 'by force' does not necessarily however imply the positive exertion of actual physical force in the act of compelling submission of the female to *the sexual connection* \* \* \* .

\* \* \*

"In order to constitute the crime of rape there must be carnal knowledge by the defendant by force and against the will of the party ravished." (Emphasis added.)

Terminology such as "carnal knowledge" and "sexual connection" here fulfills the requirement of an instruction upon penetration.[4] Moreover, there is no reasonable basis upon which the jury

[4] The prosecutor in his closing argument stated "[t]he Court will instruct you that the elements of this case, the things the People have to prove, are first of all, there was carnal knowledge between the defendant and Barbara Jean McGillen, in other words, *they had sexual intercourse* \* \* \* ." (Emphasis added.)

Moreover, 65 Am Jur 2d, Rape, p 763 states in § 3:

"The actual penetration of the female sex organ by the male sex organ is required as an element of rape, according to all authorities and this penetration constitutes *carnal knowledge, which is synonymous with sexual intercourse."* (Emphasis added.)

*"Carnal Knowledge.* Coitus; copulation; the act of a man in having sexual bodily connection with a woman; sexual intercourse. State v Normandale, 154 La. 523, 97 So. 798, 800 [1923]; Patton v State, 105 Tex. Cr. R. 128, 287 S.W. 51, 52 [1926]. There is 'carnal knowledge' if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient. State v Huggins, 84 N.J. Law, 254, 87 A. 630, 633 [1913]." Black's Law Dictionary, p 268.

could have found such an assault in this case
without penetration. Barbara testified as follows:

"*Q.* Did his penis come in contact with you in any
way?
"*A.* Yes.
"*Q.* Tell us how.
"*A.* He put his private parts in mine.
"*Q.* And about how long was he in that position?
"*A.* About five or ten minutes—I don't remember.
"*Q.* Do you know what an ejaculation is?
"*A.* I don't understand the word you are saying.
Could you put it in a different way?
"*Q.* Do you know what a climax is, a sexual climax?
"*A.* I still don't understand.
"*Q.* Do you know what the expression means, to
come?
"*A.* Yes.
"*Q.* Can you tell us whether he did that?
"*A.* Yes, he did.
"*Q.* Where did he do that?
"*A.* Partly inside of me and then the rest on the
seat."

The defendant denied the assault altogether.
The jury was faced with a simple task: accept the
girl's story of assault and penetration or her fa-
ther's story of no assault at all. They believed the
girl.

No testimony was elicited at trial upon which
the jury could have believed that an assault occur-
red without penetration.

In summary, the instructions to the jury were
plain in stating that "carnal knowledge" was an
element of the offense charged and that such had
to be accomplished by "force in the act of compel-
ling submission of the female to the sexual connec-
tion."

It would be difficult to describe penetration more

definitively to the understanding of an average person. Further, the testimony of the girl and the closing statement of the prosecutor left no room for reasonable doubt as to what she claimed to constitute the rape.

I hope that we do not become so inflexible in our requirements for the use of a chosen word that we cannot tolerate the use of a synonym or description of the same act. Certain words are depictive but are not necessarily the only ones through which members of a jury may obtain an understanding of their mission.

Two separate juries under two different judges have found this father guilty of raping his daughter. I would not substitute my findings of fact for theirs, nor can I find any good reason in the record to do so. Neither do I find any clear reason in the law to reverse. In my opinion, the girl has been successively victimized and I would not add one (or two) further trials to her ordeal.

I would affirm the trial court and the Court of Appeals.

J. W. FITZGERALD, J., concurred with M. S. COLEMAN, J.