PEOPLE v BRANNAN

OPINION OF THE COURT

1. CRIMINAL LAW—CONFESSIONS—APPEAL AND ERROR—VOLUNTARI-
   NESS—WALKER HEARING—FIRM CONVICTION—MISTAKE.

   An appellate court is required to review the entire record of a
   *Walker* hearing and to independently determine the voluntari-
   ness of an admitted confession; where the appellate court is left
   with a definite and firm conviction that a mistake was commit-
   ted, reversal is required.

2. CRIMINAL LAW—RIGHT TO COUNSEL—REQUEST FOR COUNSEL—QUES-
   TIONING—CONFESSION—EVIDENCE—ADMISSIBILITY.

   There can be no further questioning of a suspect who indicates in
   any manner and at any stage of the questioning process that he
   wishes to consult with an attorney; therefore, a confession of
   murder given by a suspect to police officers who questioned him
   on two separate occasions after he indicated he wanted to talk
   to a lawyer was inadmissible in evidence.

3. CRIMINAL LAW—PROSECUTORS—STATEMENTS OF ACCUSED—CUSTO-
   DIAL INTERROGATION—PROCEDURAL SAFEGUARDS—SELF-INCRIMI-
   NATION—HOMICIDE—MIRANDA WARNINGS.

   The prosecution may not use statements whether exculpatory or
   inculpatory stemming from questioning initiated by law en-
   forcement officers after a person has been taken into custody or
   otherwise deprived of his freedom of action in any significant
   way unless it demonstrates the use of procedural safeguards
   effective to secure the privilege against self-incrimination;
   therefore, statements made to police officers investigating a
   homicide by an individual held in jail on an unrelated charge
   were inadmissible against him in a trial for the homicide where
   the investigation of the homicide had clearly focused on the
   defendant prior to the statements and no *Miranda* warnings
   were given.

REFERENCES FOR POINTS IN HEADNOTES
[1] 21 Am Jur 2d, Criminal Law §§ 440, 441.
[2] 29 Am Jur 2d, Evidence §§ 523–596.
[3, 4] 29 Am Jur 2d, Evidence §§ 555–557.

DISSENT BY D. E. HOLBROOK, P. J.

4. CRIMINAL LAW—STATEMENTS OF ACCUSED—EVIDENCE—FOCUS OF
   INVESTIGATION—MIRANDA WARNINGS—CLEAR ERROR—APPEAL
   AND ERROR.
   *The admission into evidence of statements made voluntarily by a
   defendant after the trial court found that the defendant had
   been given* Miranda *warnings as soon as the police investiga-
   tion had narrowed on him was not clearly error and the trial
   court's ruling on the admission of such statements should not
   be disturbed on appeal.*

Appeal from Midland, James R. Rood, J. Submit-
ted March 3, 1975, at Grand Rapids. (Docket No.
17920.) Decided September 22, 1975. Leave to ap-
peal granted, 395 Mich 812.

Herbert S. Brannan was convicted of second-de-
gree murder. Defendant appeals. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Edward G. Durance,*
Prosecuting Attorney (Prosecuting Attorneys Ap-
pellate Service, *Edward R. Wilson,* Director, by
*Lee W. Atkinson,* Special Assistant Attorney Gen-
eral), for the people.

*John A. Lydick,* Assistant State Appellate De-
fender, for defendant.

Before: D. E. HOLBROOK, P. J., and BRONSON and
M. J. KELLY, JJ.

M. J. KELLY, J. Defendant was convicted of sec-
ond-degree murder in the strangulation slaying of
one Peggy Ann Smith. Jury verdict was entered on
April 30, 1973, and defendant's appeal of right
followed in due course. The appeal cites four in-
stances of allegedly reversible error. We take up
only the last claim of error because it requires

reversal and the other claimed errors will probably not arise again on retrial.

The body was found on December 1, 1972. Between that date and February 15, 1973, this 17-year old defendant was questioned by the police five times without receiving *Miranda, infra,* warnings. Three of these sessions took place after the investigation had focused on the defendant. There were two more occasions when the defendant was given *Miranda* warnings. These sessions took place at the state police post in Bay City, where he had been brought for a polygraph test. On each occasion, that is on the sixth occasion and on the seventh occasion, he confessed.

Prior to trial a *Walker*[1] hearing was held on a defense motion to suppress confessions obtained after the *Miranda* warnings were given on February 16, 1973. The trial court held the two confessions admissible on the strength of testimony by the detective in charge that in his opinion the investigation had not focused on the defendant until February 16th. The earlier five interviews were then held to be routine police procedure. The trial court allowed the confessions in evidence that resulted from interrogations six and seven but it also allowed statements obtained in the earlier interviews.

On review of a *Walker* hearing an appellate court is required to review the entire record and independently determine voluntariness. *People v Robinson,* 386 Mich 551; 194 NW2d 709 (1972), *People v Inman,* 54 Mich App 5; 220 NW2d 165 (1974). We reverse here as "we are left with a definite and firm conviction that a mistake was committed". *People v Scott,* 44 Mich App 462; 205

---

[1] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

NW2d 291 (1973), *People v McGillen #1,* 392 Mich 251; 220 NW2d 677 (1974).

The first interview was conducted at the Midland police station when the defendant came to be interviewed in answer to a telephone call from the officer in charge. At that time exculpatory explanations by defendant included a statement that he had been in Tawas for the preceding ten days working on a truck. On later occasions he gave the names of four alibi witnesses to support his story.

On the second occasion, which occurred on January 31, 1973, the defendant was in custody on an unrelated matter. The detective in charge of the Smith murder was also assigned to a theft case which involved a juvenile and he went to the county jail on January 31, 1973, to interview defendant Brannan with regard to the juvenile theft case. Two conversations took place on January 31st. About the first conversation, after the statement was taken concerning the juvenile, the detective testified as follows:

"*Q.* Was the Peggy Smith matter mentioned that time?

"*A.* Yes. Just before I left.

"*Q.* What did you say?

"*A.* I asked him if he had any other information about the Peggy Smith matter."

The detective then went on to say that Brannan was not a firm suspect at that time. However, the perspective changed later that day.

The deceased was found with a portion of a clothesline rope around her neck; the local newspaper had printed that "an autopsy report indicates Mrs. Peggy Smith, 35, was—at 707 West Buttel Street, died of strangulation from a clothesline, Prosecutor Edward G. Durant said today". On

the second visit to the defendant of January 31st, the detective went to query defendant about the rope because he had been informed by defendant's mother that she was missing 50 feet of clothesline rope. Still he did not give *Miranda* warnings. This is the officer's testimony:

"*Q.* What time would be the first time you saw him?

"*A.* Approximately 8:30, 9 o'clock in the morning.

"*Q.* And the second time, please, sir?

"*A.* I think about 2:30 in the afternoon.

"*Q.* The reason going back the second time?

"*A.* I had received some information that day.

"*Q.* Information pertaining to Mr. Brannan?

"*A.* Yes.

"*Q.* And pertaining to the Peggy Smith matter?

"*A.* Yes.

"*Q.* Information making him a suspect?

"*A.* Information which I felt checking back with him to see if he could give me any clarification on.

"*Q.* What did you say to Mr. Brannan when you went in the second time on the 31st, being the third time you talked to him about the Peggy Smith matter, is that correct?

"*A.* Yes.

"*Q.* What did you say to him this third time when you went in?

"*A.* I asked him if he was still willing to take the polygraph.

"*Q.* And his reply?

"*A.* He said that he didn't think he wanted to; that he'd have to check with a lawyer."

This should have stopped the interrogation forthwith as *Miranda* requires that if a suspect indicates in any manner and at any stage of the process he wishes to consult with an attorney, there can be no questioning. *Miranda v Arizona,* 384 US 436, 477; 86 S Ct 1602; 16 L Ed 2d 694; 10

ALR3d 974 (1966), *People v Ansley,* 18 Mich App 659, 667; 171 NW2d 649 (1969). But even after the red flag was thrown by defendant's reference to a lawyer the detective persisted:

"*Q.* All right. Did you say anything else to him?

"*A.* He was advised of the fact that I had found some rope or had thought I had found where the rope had come from.

"*Q.* Well, tell me what you told him.

"*A.* I told him—I told him that I had had a report of some missing rope. I didn't know whether it tied in or not, but I wanted to talk to him about it.

"*Q.* Missing rope from who?

"*A.* From his mother.

"*Q.* And what else did you tell him?

"*A.* Nothing. He told me where he had been and who he had been with.

"*Q.* Had you advised him of his rights at this time?

"*A.* No.

"*Q.* This is the third time that he was—talked to you regarding the Peggy Smith matter and you still hadn't advised him of any kind of rights?

"*A.* That's correct.

"*Q.* Now, the mother told you that she had clothes-line rope that was missing, is that correct?

"*A.* Yes.

"*Q.* And this clothesline rope, was it similar or dissimilar to the rope that was found around the deceased's neck?

"*A.* This I don't know.

"*Q.* Well, I am not asking you to speak scientifically. I am merely saying, were they? Did you see the rope around the deceased's neck?

\* \* \*

"*Q.* Were you told what kind of rope it was, sir?

"*A.* I was told, yes.

"*Q.* And what kind of rope did they tell you?

"*A.* White cotton clothesline rope.

"*Q.* And what kind of rope did Mrs. Brannan say was missing?

"*A.* That is what she said she was missing.

"*Q.* What is that?

"*A.* The white cotton or some white cotton clothesline.

"*Q.* And at this time you knew this. Had you knew that Mr. Brannan knew Mrs. Smith? Is that correct?

"*A.* Yes."

Not only did the officer proceed with his questioning on January 31st, but again approximately a week later he went to see defendant again in the county jail:

"*Q.* And the reason you went to see him this time, sir?

"*A.* To see what his lawyer had said about a polygraph.

"*Q.* Did he tell you who his lawyer was?

"*A.* Yes.

"*Q.* Who did he say?

"*A.* Oscar Baker, Jr. I believe.

\* \* \*

"*Q.* And his reply?

"*A.* He said that his lawyer had told him not to.

\* \* \*

"*Q.* Did you see him again?

"*A.* Yes.

"*Q.* And when was this?

"*A.* On the 15th of February.

"*Q.* By the way, did you check to see if he really had a lawyer?

"*A.* On the 15th of February I attempted to, yes.

"*Q.* All right. Prior to the 15th of February did you check to see if he had a lawyer?

"*A.* No."

Again he was questioned and again he was not

given the *Miranda* warnings even though he was
in custody, the investigation had clearly focused
on him, and in a previous interrogation he had
mentioned that he wanted to talk to his lawyer.
Furthermore, by this time the detective had done
some checking on the alibi and found out it was
very questionable:

"*Q.* Now this would be the fifth time you talked to
him. At this time did you advise him of any rights?
"*A.* No."

It's true, as the dissent points out, that defend-
ant was taken to Bay City on the 15th to take a
polygraph on an unrelated charge. However it's
important to note that the detective in charge of
this case traveled to Bay City specifically to talk to
defendant about his alibi in this case. He testified
that he first attempted to reach Oscar Baker, Jr.
at his office but was told by the attorney's secre-
tary that he was in Midland. The officer then
made his trip to Bay City and interrogated defend-
ant anyway.

The fact that a police officer states that the
investigation had not focused on the defendant at
this time ignores the reality of the situation and
strains credulity. The defendant had been an ad-
mitted acquaintance of the deceased; he had given
a shaky alibi in prior interrogations and his
mother was missing the kind of rope the deceased
was strangled with. Palm prints of the defendant
had been obtained at the scene of the crime. He
must have been a prime suspect.

As previously noted, exculpatory statements
made by the defendant on January 31st and Feb-
ruary 15, 1973, were admitted into evidence. This
is also a violation of the letter and spirit of *Mi-*

*randa.* No distinction is made between exculpatory and inculpatory statements in the crucial *Miranda* language found at 384 US 436, 444; 86 S Ct 1602, 1612; 16 L Ed 2d 694, 706:

"Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4]"

Footnote 4 adds:

"4. This is what we meant in *Escobedo [Escobedo v Illinois,* 378 US 478; 84 S Ct 1758; 12 L Ed 2d 977 (1964)] when we spoke of an investigation which had focused on an accused."

The *Miranda* opinion continues (384 US 436, 477; 86 S Ct 1602, 1629; 16 L Ed 2d 694, 725):

"The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom in any significant way."

We do not offer any mathematical formula. We do not say that four in-custody interrogations vitiate any subsequent statement or confession obtained following the giving of proper *Miranda* warnings on a sixth or later occasion. We say only that under the totality of circumstances existing

on this record, the warnings given prior to the
sixth interrogation at the door to the polygraph
lab, did not satisfy the letter or spirit of the
*Miranda* commandment, and that the people have
not sustained the heavy burden of demonstrating
"that the defendant knowingly and intelligently
waived his privilege against self-incrimination and
his right to retained or appointed counsel". *Esco-
bedo v Illinois, supra,* 490 n. 14.

We reverse and remand for new trial barring
the exculpatory or inculpatory statements or con-
fessions made by the defendant during his in-cus-
tody interrogations numbered two through seven
as here discussed. Information obtained during the
first interrogation while the defendant was a will-
ing visitor to the station house and not in custody
is not barred.

BRONSON, J., concurred.

D. E. HOLBROOK, P. J. *(dissenting).* This writer is
unable to agree with the majority, not being "left
with a definite and firm conviction that a mistake
was committed" at defendant's *Walker* hearing.

It is apparently conceded that, as of the time of
the first two interviews, the investigation had not
narrowed on the defendant. Between the second
and third interrogations, the police were told by
defendant's mother that she was missing a clothes-
line rope similar to the rope found around the
neck of the murder victim. It is this information
which apparently causes the majority to conclude
that the investigation had then narrowed on the
defendant. As a matter of fact, however, the police
had been checking on an alibi that defendant had
given at a prior interview, and had found no
reason to believe the alibi was untrue. Further,
there was no effort made at that time to ascertain

whether or not defendant's fingerprints were among those found at the scene of the murder. This was not done until sometime after the interview on February 15, 1973 (that being the fifth interview). Had the investigation narrowed on the defendant at the time of the third interview, it seems strange indeed that the police would wait two weeks to find whether defendant's fingerprints had been left at the scene of the crime. Approximately one week after the second January 31st interview the defendant was asked whether or not he would take a lie-detector test. He said he would not do so until he had talked to his attorney. He was not questioned further at that time. On February 15 defendant was in Bay City to take a polygraph examination on another matter. At this time, still no effort had been made to place defendant at the scene of the crime through fingerprints. On February 16 it was discovered that defendant's fingerprints were in the house where the murder had occurred. Also, on this date defendant agreed to take a polygraph test. He was warned of his rights and he confessed.

There is absolutely nothing in the record to indicate that defendant was forced to say anything against his will. In fact, there is nothing in the record, other than the tale of the missing clothesline, to indicate that the investigation had narrowed on the defendant. At least five others had submitted to a polygraph examination concerning the murder in question. Other suspects existed. There was evidence that the dead woman's estranged husband had been with her earlier in the evening on the day she was murdered. There was evidence that she had telephoned another man on the night of her murder. This man claimed that he had never been to her home, but later changed his

story. As it developed, there was expert testimony which established that the clothesline which defendant's mother had lost could not have been the clothesline found at the scene of the murder.

The trial court found that, until the sixth interrogation, the finger of guilt had not yet pointed at this defendant. The lower court also found that all the statements that defendant made were made voluntarily. This writer finds nothing in the record which warrants a "definite and firm conviction that a mistake was committed" below. I would therefore vote to affirm.